FILED

02/06/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0225

DA 17-0225

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 17

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

ANNA-GRACE JEFFRIES,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2017-0067
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Martin W. Judnich, Vincent J. Pavlish, Judnich Law Office, Missoula, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Jim Nugent, City Attorney, Angela Suzanne Robertson-Bakken, Deputy City Attorney, Missoula, Montana

Submitted on Briefs:  December 13, 2017

Decided:  February 6, 2018

Filed:

                                Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Anna-Grace Jeffries (Jeffries) appeals from an order of the Fourth Judicial District Court, Missoula County, affirming the Missoula Municipal Court (Municipal Court). The Municipal Court denied Jeffries's motion to exclude breath evidence in a Driving Under the Influence of Alcohol (DUI) proceeding against her. We affirm.

¶2 We restate the dispositive issue as:

*Did the Municipal Court abuse its discretion by denying Jeffries's motion to exclude breath evidence?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In the early morning of March 24, 2016, Missoula Police Officer Kamura observed Jeffries driving with no taillights and initiated a traffic stop. Jeffries's vehicle had a large portion of its front bumper missing, only one operational headlight, and was dripping fluid. Further investigation revealed recent property damage along Jeffries's route where pieces of her vehicle were left behind. Upon contact, Officer Kamura noticed Jeffries's speech was slurred. Jeffries admitted to having two or three mixed drinks several hours earlier. While assisting Officer Kamura, Missoula Police Officer Jensen also noticed Jeffries's speech was slurred and noted additionally that her eyes were bloodshot, she was unsteady on her feet, and her breath smelled strongly of alcohol. Jeffries's performance on Standard Field Sobriety Tests indicated she was impaired. Officer Jensen arrested Jeffries and transported her to the Missoula County Detention Center. Jeffries provided a breath sample on the Intoxilyzer 8000, which indicated she had an alcohol concentration of 0.217. The City of Missoula (the City) charged Jeffries with aggravated DUI, failure to have

2

operational headlights and taillights, failure to carry proof of insurance, and failure to give notice of an accident causing property damage.

¶4     During discovery, Jeffries requested information about the Intoxilyzer 8000 used to take her breath sample. Specifically, she requested production of the calibration and testing records for the three months prior to March 24, 2016, any dates it was taken out of service, and any reason it was removed from service. The City provided this information to Jeffries. Additionally, Jeffries requested production of all Computer Online Breath Records Archive (COBRA) data for the Intoxilyzer 8000 for the twelve months prior to March 24, 2016. The City did not possess or have access to the COBRA data requested and did not provide this information to Jeffries. Jeffries filed a motion to compel this disclosure. Jeffries did not request the printed records for the Intoxilyzer 8000 for the twelve months prior to March 24, 2016. The State of Montana Forensic Science Division maintains the printed records.

¶5     Jeffries filed a motion in limine to exclude her Intoxilyzer 8000 breath test results or dismiss her DUI charge as a sanction against the City for failing to produce the requested COBRA data. In her motion to exclude, Jeffries argued the City intentionally spoliated, or destroyed, the COBRA data she requested by not purchasing software that would allow the City to access it and by periodically deleting the Intoxilyzer 8000's internal memory card. Alternatively, relying on *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988), Jeffries argued the City violated her due process rights by not purchasing software that would allow the City to access COBRA data and by periodically deleting the Intoxilyzer 8000's internal memory card.

3

¶6      The Municipal Court held an evidentiary hearing on Jeffries's motion to exclude. Benjamin Vetter (Vetter), the director of the Breath Alcohol Program at the State Crime Lab, testified that an Intoxilyzer 8000 is a computer manufactured by CMI, Inc., (CMI) and approved by the National Highway Traffic Safety Administration that uses infrared technology to conduct breath analysis of suspected impaired drivers.  Vetter testified that CMI sells software that allows COBRA data to be transferred from an Intoxilyzer 8000's internal memory card and accessed online, but Montana does not have this type of software. Regardless of the type of software used, each Intoxilyzer 8000 saves information for every breath test it completes on an internal memory card.  In Montana, the internal memory card of each Intoxilyzer 8000 is deleted annually during regularly conducted maintenance.  If an Intoxilyzer 8000's internal memory card fills up prior to its annual maintenance, new test results automatically overwrite older tests.  Vetter explained that at the time the State purchased the Intoxilyzer 8000s it currently uses, the State did not have the infrastructure, dedicated phone lines or Internet access, or money to purchase the COBRA-transferring software.

¶7      Vetter testified that after an Intoxilyzer 8000 performs a breath test, it typically prints several copies of the test results on a Breath Analysis Report Form, suitably referred to as "BARF."  A BARF contains the serial number of the Intoxilyzer 8000 performing the test; the time, date, and location of the test; and the test taker's name, date of birth, and sex. A BARF lists the test sequence results, which include several air blanks, several diagnostic and calibration tests, and the breath volume and amount of alcohol detected from two separate breath samples of the test taker.  If an error occurs during testing, an error code

4

populates on the Intoxilyzer 8000's screen or prints. No BARF will print in the case of an error.

¶8     Vetter testified that COBRA data stored on the internal memory card contains "potentially" more information than what is printed on the BARF. Vetter explained that having access to the COBRA data relevant to Jeffries's Intoxilyzer 8000 breath test result is not necessary to assure the validity of her test result. Vetter testified that he could tell the Intoxilyzer 8000 was correctly functioning on March 24, 2016, by looking at Jeffries's BARF.[1] Vetter testified that instead of being helpful to invalidate or discredit an individual BARF, additional COBRA data, if any, could be helpful to complete statistical analysis

---

[1] When asked to "walk us through" Jeffries's BARF, Vetter testified:

So the first thing the instrument is going to do once the officer has entered all their data and the subject data is run an air blank. The air blank turns on a pump that pulls in fresh air from the room. It clears out the instrument and establishes zero. If the air blank passes, you see zero across from that, which we see here.

     The next is a diagnostic combined with what's call[ed] an ITP. The diagnostic checks everything in the instrument electronically and analytically and mechanically. So it's going to check, for example, the heaters check. It's going to check the clock. It's going to check the IR source to make sure that it's producing infrared, et cetera. And then it's going to run the I.T.P., which is a simulated alcohol standard at .080. That has to return results of .075 to .085. If all that is in the place, you see pass, which we see here. We return to an air blank, we get zero.

     Then we introduce a calibration check from an alcohol standard. The standard is .080. We have to see results from this actual alcohol standards of .075 to .085. In this instance we have .080, which is exactly what we are looking for.

     Then we have two air blanks because the officer had to answer a question. It took him time to do so. The first subject test is .226, 1.8 liters. We go into the second subject test. We start with an air blank again. We have a diagnostic I.T.P., another air blank, a calibration check. The .080 came back .079, which is about 1% from target value.

     Another air blank, the final subject test .217, 2.44 liters were provided, a final air blank to get back to zero, and then the reported alcohol concentration of .217.

     So all of those things put together give us the quality assurance and quality control for this particular test at this time point in time that I would be comfortable saying this instrument was working properly as programmed.

and identify the historical trends of an Intoxilyzer 8000. Vetter testified that comparing all the BARFs from a particular Intoxilyzer 8000 to BARFs from another Intoxilyzer 8000 is another way to perform a similar statistical analysis.

¶9 Matthew Malhiot (Malhiot), the proprietor of Forensic Alcohol Consulting & Training, also testified at the evidentiary hearing. Malhiot has experience working as a police officer and has extensive training from CMI on the Intoxilyzer 8000. Malhiot testified that COBRA data can be used for troubleshooting and statistical analysis. Malhiot testified about two instances in Florida where the Florida Defense Bar utilized COBRA data, which the State of Florida makes publicly available online, to discover software issues with the Intoxilyzer 8000. One instance occurred in 2006 where a software "glitch" "erroneously assigned error messages that were not applicable or failed to assign error messages that were applicable" when test takers began, but did not complete their breath test within the allotted testing time. As a result of the 2006 software glitch, Malhiot testified that the State of Florida issued 168 *Brady* notifications to defendants whose Intoxilyzer 8000 test results may have been impacted. There was another issue in 2009 where the Florida Defense Bar reviewed COBRA data and noticed that the Intoxilyzer 8000's flow sensors were measuring abnormally high breath volume, amounts that were not "humanly possible." Malhiot testified that, in Montana, the data stored on the Intoxilyzer 8000's internal memory card and not printed on the BARF is "potentially useful" to "look at the data statistically and evaluate the breath test machine operation over time." Without COBRA data, Malhiot testified he would have to "manually go through the breath tests" and would not be able to incorporate any data that is internally stored.

¶10 After the hearing, the Municipal Court denied Jeffries's motion to exclude her Intoxilyzer 8000 breath test results. In its order, the Municipal Court concluded that: (1) the State was not required to maintain information or data in the most convenient format for Jeffries; (2) spoliation was not applicable; and (3) "[Jeffries] did not establish that the COBRA data constituted exculpatory evidence" as required under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), to establish a due process violation. Jeffries reserved her right to appeal the adverse determination of her motion to exclude. The Municipal Court held a bench trial, where the City presented Jeffries's Intoxilyzer 8000 breath test results, and Jeffries was found guilty of aggravated DUI, failure to have operational headlights and taillights, failure to carry proof of insurance, and failure to give notice of an accident causing property damage. Jeffries appealed to the Fourth Judicial District Court, Missoula County. The District Court affirmed the Municipal Court's order denying Jeffries's motion to exclude. Jeffries appeals.

## STANDARD OF REVIEW

¶11 This Court reviews cases that originate in municipal court and are appealed to district court as if the appeal were originally filed in this Court, examining the record independently of the district court's decision. *Stanley v. Lemire*, 2006 MT 304, ¶ 26, 334 Mont. 489, 148 P.3d 643. A court's decision regarding a motion in limine is an evidentiary ruling which will not be overturned absent a showing of abuse of discretion. *State v. Delaney*, 1999 MT 317, ¶ 6, 297 Mont. 263, 991 P.2d 461. A court abuses its discretion if it acts arbitrarily, without employing conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *State v. Kaarma*, 2017 MT 24, ¶ 6, 386 Mont. 243, 390 P.3d 609.

7

¶12    *Did the Municipal Court abuse its discretion by denying Jeffries's motion to exclude breath evidence?*

¶13    On appeal, Jeffries relies on federal authority to argue her right to due process was violated by the State's failure to disclose the COBRA data underlying her Intoxilyzer 8000 breath test results.  Jeffries argues the Municipal Court erred by failing to analyze whether the COBRA data was potentially useful and by concluding the COBRA data was not exculpatory under *Brady*.  Jeffries contends the uncontroverted evidence presented to the Municipal Court established that the COBRA data was potentially useful to conduct additional analysis and the State acted in bad faith. Jeffries maintains that, under *Youngblood*, the Municipal Court erred by denying her motion to exclude breath evidence.

¶14    The State[2] responds by arguing that COBRA data is not necessary to determine whether the Intoxilyzer 8000 accurately measures alcohol concentration or helpful to discredit the reliability or veracity of Jeffries's breath test result.  The State argues Jeffries failed to establish that the COBRA data was exculpatory or that the State acted in bad faith. The State concludes the Municipal Court correctly denied Jeffries's motion to exclude breath evidence.

¶15    It has long been established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97.  In *United States v. Bagley*, the

---

[2]  The City charged Jeffries and was a party to her Municipal Court trial and District Court appeal. On appeal to this Court, the State assumed the City's adversarial role.

8

United States Supreme Court clarified that "evidence is material" within the meaning of *Brady* when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). In *Brady*'s wake, two United States Supreme Court cases have applied its holding to test when the government's failure to preserve evidence rises to the level of a due process violation: *California v. Trombetta* and *Arizona v. Youngblood*.

¶16    In *California v. Trombetta*, faced with an issue relating to the failure to preserve the actual breath sample underlying Intoxilyzer breath test results, the United States Supreme Court cautioned, "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Trombetta*, 467 U.S. at 486, 104 S. Ct. at 2533. The *Trombetta* Court noted that to meet the standard of "constitutional materiality" implicating *Brady*, the evidence at issue "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534. The *Trombetta* Court concluded that although the "preservation of breath samples might conceivably have contributed to respondents' defenses, . . . the chances are extremely low that preserved samples would have been exculpatory." *Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534 (observing that once the Intoxilyzer indicated respondents were legally drunk, breath samples were much more likely to provide inculpatory rather than exculpatory evidence). The *Trombetta* Court discussed the accuracy of the Intoxilyzer at issue, its certification by the California Department of Health,

9

its acceptance by the National Highway Traffic Safety Administration, and its method of protecting suspects from machine malfunctions by taking two breath samples from the test taker and purging the air in between. *Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534.

¶17    Here, as in *Trombetta*, the COBRA data Jeffries requested was not apparently exculpatory before it was destroyed. *See Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534. Vetter testified that the COBRA data could "potentially" contain more information than Jeffries's BARF; however, it could also potentially contain no additional information. Therefore, the COBRA data Jeffries requested might not add to the information provided in her BARF. Even assuming the COBRA data provided more information than Jeffries's BARF, this additional information was more likely to provide additional inculpatory rather than exculpatory evidence. Although the COBRA data underlying Jeffries's breath test could have conceivably contributed to her defense, the chance it would have provided exculpatory evidence is extremely low. *See Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534.

¶18    Furthermore, to establish a due process violation, the defendant must prove she was "unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534. Here, both Vetter and Malhiot explained that an expert could have conducted a comparable statistical analysis, without the additional COBRA data, by "manually" analyzing the printed records. Intoxilyzer 8000 records, containing BARFs and printed error messages, are reasonably available because the Forensic Science Division maintains them. However, Jeffries failed to request the printed records for the same twelve-month period she claimed she was deprived of COBRA data. The Municipal Court commented on this inconsistency and concluded that the State is not obligated to maintain data in its most convenient form.

¶19 Finally, consistent with the observations made by the United States Supreme Court in *Trombetta* of California's certification process, the State of Montana likewise closely regulates Intoxilyzer 8000s. The Department of Justice has adopted regulations for law enforcement agencies that assure the accuracy of breath tests. *State v. Jenkins*, 2011 MT 287, ¶ 5, 362 Mont. 481, 265 P.3d 643. "The regulations require that the accuracy of the instruments be certified annually by the State and once every 31 days in the field, usually by the local law enforcement agency." *Jenkins*, ¶ 5.

¶20 Jeffries also relies on *Arizona v. Youngblood* as authority to suppress her breath evidence. Youngblood argued his right to due process was violated by the State's failure to test, or preserve for later testing, semen samples in a child molestation, sexual assault, and kidnaping proceeding against him. *Youngblood*, 488 U.S. at 52, 109 S. Ct. at 334. The failure to test or adequately preserve the samples made later testing of the samples unsuccessful. *Youngblood*, 488 U.S. at 53-54, 109 S. Ct. at 335. At trial, Youngblood argued he was not the perpetrator and experts testified what might have been shown by tests performed on the samples shortly after they were gathered, or if the samples had been refrigerated. *Youngblood*, 488 U.S. at 54, 109 S. Ct. at 335. The United States Supreme Court declined to find that due process required police "to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337. The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337.

¶21    *Youngblood* establishes that the State, absent bad faith, does not have a duty to preserve all potentially useful evidence.  Here, the COBRA data is, at best, only potentially useful to Jeffries.  Moreover, Vetter testified that the State did not purchase the software allowing access to the data because it lacked infrastructure and funding.  Further, Vetter testified that the State regularly deletes the COBRA data from the internal memory cards to make room for new tests, regardless of the particular case or identity of the test taker.  Vetter testified that Intoxilyzer 8000s are used across the State, including in remote areas of Montana and on tribal lands.  At the time Montana started to use the Intoxilyzer 8000, some areas Vetter believed did not have either Internet access or a phone line available to transfer the COBRA data.  Vetter explained the State was able to purchase the Intoxilyzer 8000s because of a federal grant and funding for the additional COBRA-transferring software was not available.  Thus, Jeffries fails to present evidence that these considerations and decisions exhibit bad faith.  Absent bad faith, the State's failure to preserve or make available "potentially useful" COBRA data does not rise to the level of a due process violation.

¶22    In Montana, to assert a *Brady* violation, a party "must establish:  (1) the State possessed evidence including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different." *State v. Weisbarth*, 2016 MT 214, ¶ 20, 384 Mont. 424, 378 P.3d 1195.  Jeffries does not argue the State possessed and then suppressed COBRA data; Jeffries argues the State's failure to produce COBRA data denied her due process.  "To amount to a denial of due process, evidence that is negligently destroyed must be material and of substantial use,

vital to the defense, and exculpatory." *State v. Wagner*, 2013 MT 47, ¶ 27, 369 Mont. 139, 296 P.3d 1142 (internal quotations omitted).

¶23 Here, however, Jeffries failed to establish that the COBRA data she requested was material or substantially useful. Experts testified only that COBRA data potentially added to existing BARF information and was potentially useful. In fact, Vetter testified Jeffries's BARF indicated her breath test was accurate and any additional COBRA data would not be useful to discredit her results. Significantly, the COBRA data Jeffries requested was more likely to contain inculpatory rather than exculpatory evidence. Lastly, experts testified that a comparable analysis could have been, but was not, performed. As the Ninth Circuit explained:

> A due process violation may arise where the government has intentionally destroyed evidence knowing it is of value for the defense against criminal charges. But where evidence is routinely destroyed or lost by the government with no knowledge that the evidence is likely exculpatory, and the evidence is later sought for testing, the destruction or loss of such evidence is not fundamentally unfair to a defendant and will not offend traditional notions of due process.

*U.S. v. Toro-Barboza*, 673 F.3d 1136, 1150 (2012). We conclude the State's failure to possess software making COBRA data accessible did not infringe upon Jeffries's right to due process of law. The Municipal Court did not abuse its discretion in denying Jeffries's motion to exclude and the District Court did not err in affirming.

¶24 As an additional matter, Jeffries alternatively argues that the State intentionally spoliated, or destroyed, the COBRA data relevant to Jeffries's Intoxilyzer 8000 breath test results. This Court examined spoliation of evidence as a civil cause of action in *Oliver v. Stimson Lumber Co.*, 1999 MT 328, 297 Mont. 336, 993 P.2d 11. "Relevant evidence is critical to the search for the truth. The intentional or negligent spoliation of evidence

13

cannot be condoned and threatens the very integrity of our judicial system. There can be no truth, fairness, or justice in a civil action where relevant evidence has been destroyed before trial." *Oliver*, ¶ 31. Spoliation of evidence is a tort sanctionable as a discovery abuse under the Montana Rules of Civil Procedure. *Spotted Horse v. BNSF Ry. Co.*, 2015 MT 148, ¶ 20, 379 Mont. 314, 350 P.3d 52.

¶25 Spoliation is not applicable, however, in a criminal proceeding governed by the rules of criminal procedure codified in Title 46, MCA. Title 46 "governs the practice and procedure in all criminal proceedings except where provision for a different procedure is specifically provided by law." Section 46-1-103, MCA. Rules of law respecting disclosure and preservation of potential evidence are likewise established by federal and state precedent in criminal cases. Jeffries does not advance a different, applicable procedure or legal authority for her proposition that this Court apply a civil remedy to her criminal proceeding. Neither the Municipal Court nor the District Court erred in concluding that spoliation is not applicable to Jeffries's criminal proceeding.

## CONCLUSION

¶26 The State did not deny Jeffries due process of law by failing to provide the COBRA data underlying her breath test because it did not act in bad faith. The Municipal Court did not abuse its discretion by denying Jeffries's motion to exclude breath evidence.

¶27 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE