FILED

08/09/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0409

DA 20-0409

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 156

STATE OF MONTANA,

Plaintiff and Appellee,

v.

HOLLY ANNE MATHIS, a/k/a
HOLLY ANNE NORLING,

Defendant and Appellant.

APPEAL FROM:     District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DC 18-56
Honorable Robert G. Olson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant Appellate
Defender, Helena, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Michael P. Dougherty,
Assistant Attorney General, Helena, Montana

Kent M. Sipe, Fergus County Attorney, Jean Adams, Deputy County
Attorney, Lewistown, Montana

Submitted on Briefs:  June 15, 2022

Decided:  August 9, 2022

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Appellant Holly Mathis (Mathis) was convicted of incest by a jury in the Tenth Judicial District Court, Fergus County. Mathis presents the following issues for review:

1. *Whether the District Court correctly denied Mathis's motion to interview T.N. and J.M.?*

2. *Whether the State's failure to lodge with the District Court forensic interviews from a different case violated Mathis's right to a fair trial?*

3. *Whether this Court should exercise plain error review to consider if the District Court should have given a specific unanimity instruction?*

¶2     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### a.     Disclosures of Abuse

¶3     In 2016, Mathis married Timothy Norling Sr. (Norling). Mathis had two daughters from a prior marriage—an eleven-year-old daughter, N.M., and a seven-year-old daughter, J.M. Norling had one son from a previous marriage, T.N., who was nine years old. Following their marriage, Mathis and Norling lived with their three children in Lewistown for the next two years.

¶4     On March 29, 2018, N.M. disclosed to a counselor at her school that Norling had sexually abused her. In forensic interviews conducted that same day, N.M. and J.M. revealed they had been sexually abused by Norling while in the family's home in Lewistown. On April 4, 2018, a forensic interview was also conducted of T.N. in connection with Norling's case. The April 2018 interview with T.N. was never made available in Mathis's case. The State has asserted on multiple occasions that, during this

2

April 2018 interview, T.N. "did not make any disclosures about abuse to himself, [N.M.], or [J.M.]" by either Norling or Mathis. On April 25, 2018, Norling was charged with two counts of incest. He eventually pleaded guilty and was sentenced to prison. Mathis finalized her divorce from Norling on June 26, 2018.

¶5      In the months following their stepfather's arrest, both N.M. and J.M. began to see licensed clinical professional counselors to discuss the trauma that resulted from their abuse by Norling. During a counseling session with J.M. on July 16, 2018, J.M. disclosed to her counselor that her mother, Mathis, had sexually abused T.N. by asking T.N. to touch her breasts. The counselor reported J.M.'s allegation against Mathis to law enforcement,[1] and the State obtained an investigative subpoena of the counselor's records.

¶6      Following J.M.'s disclosure, T.N. was interviewed on July 26, 2018. During this interview, T.N. disclosed that Mathis would frequently walk around the house half-naked. He also recounted two specific instances where Mathis had sat in front of him while topless and encouraged him to touch her bare breasts, which he then did. According to T.N.'s disclosure, the first instance of abuse occurred when he was ten years old, while the second instance occurred more recently when he was eleven years old. Based on T.N.'s allegations, the State charged Mathis on August 24, 2018, with two counts of incest. Count I charged Mathis with incest between December 2016 and December 2017, the twelve-month-period during which T.N. was ten years old. Count II charged Mathis with

---

[1] During her testimony at Mathis's trial, J.M.'s counselor disclosed that her legal duty to report J.M.'s new abuse allegations to police caused a slight "rupture" in her relationship with J.M., as J.M. did not wish to see her mother get in trouble with law enforcement.

incest between December 2017 and March 2018, which reflected the three-month-period prior to T.N.'s removal from Mathis and Norling's home. The record reflects that the entire July 2018 forensic interview of T.N. was provided to the defense during discovery.

### b. Pretrial & Discovery Stage

¶7 On December 21, 2018, Mathis filed a motion to obtain confidential criminal justice information (CCJI) from Norling's criminal case. Her motion requested all information "associated with *State of Montana v. Timothy E. Norling* . . . including, but not limited to, police reports, notes, investigations, medical records and reports, and forensic interviews and other information relating to [the] child victims in [Norling's] case." Additionally, Mathis requested all of J.M., N.M., and T.N.'s "psychological and counseling records" and "school records," maintaining this information was relevant and potentially exculpatory.

¶8 On January 11, 2019, the State filed an objection to producing the March 2018 forensic interviews of N.M. and J.M.—as well as the April 2018 forensic interview of T.N.—that were conducted pursuant to the State's investigation of Norling. The State maintained the interviews were confidential and not relevant because they pertained only to Norling's charges. However, while noting it did not share this position, the State's response conceded that "an argument could be made that the [April 2018] forensic interview of [T.N.] . . . is 'exculpatory,' as [T.N.] d[id] not disclose any sexual abuse" by Mathis during that interview. As a result, the State offered to lodge the interview with the court for in camera review. The State also objected to Mathis's request for N.M., J.M., and T.N.'s psychological and counseling records, asserting the information was confidential

4

and that Mathis's request was overly broad. In particular, the State asserted that, for confidential information that is "not exculpatory or necessary for the preparation of [a] defense," a defendant's "right to review the medical and psychological records of the victim in an incest case is outweighed by [a] child's right to confidentiality." *State v. Duffy*, 2000 MT 186, ¶ 21, 300 Mont. 381, 6 P.3d 453 (citations omitted). The State also noted that the only counseling records in its possession were J.M.'s July 2018 counseling records disclosing Mathis's abuse, which it offered to lodge with the court for in camera review.

¶9 On March 7, 2019, the District Court issued an Order (March 2019 Order) providing that it would conduct a review of the "psychological, counseling, and school records" of "all three victims in chambers to ensure that no exculpatory [evidence] exists therein." The Order provided that the State was to lodge J.M.'s counseling records from July 2018 with the court, as the State had indicated that these records were already in its possession. However, the Order also provided that it was Mathis's responsibility to separately motion for a subpoena duces tecum under § 46-15-106, MCA, to obtain "all other psychological, counseling[,] and school records" that were not in the State's possession. Importantly, the March 2019 Order did not address the three forensic interviews that were conducted with N.M. in March 2018, J.M. in March 2018, and T.N. in April 2018 in connection with Norling's criminal case. Instead, when addressing Mathis's request for CCJI from Norling's case, the Order only directed the State to submit all "potentially exculpatory" evidence in its possession to the court for in camera review. The March 2019 Order made no mention of any need for the State to lodge T.N.'s April 2018 forensic interview with the

5

court. The March 2019 Order's only reference to the April 2018 forensic interview with T.N. is made at the beginning of the Order, while the court is reciting the facts of the case; notably, this reference states only that the April 2018 interview occurred and that "[d]uring the course of that interview, [T.N.] did not make any disclosures about any abuse to himself, to [N.M.], or to [J.M.]." Accordingly, following the March 2019 Order, the State lodged only J.M.'s July 2018 counseling records with the court. It did not lodge any of the three forensic interviews of N.M., J.M., and T.N. Notably, Mathis did not—at any point during proceedings before the District Court—raise an objection to the State's failure to lodge these forensic interviews with the Court based on the instructions provided to the State in the court's March 2019 Order. Next, after reviewing only J.M.'s July 2018 counseling records in camera, the court ordered the State to provide the full contents of these records to Mathis, and the State complied.

¶10    On June 28, 2019, Mathis filed a motion asking the court to issue a subpoena duces tecum commanding the Department of Public Health and Human Services (DPHHS) to provide the following documents to the court for in camera review:

> All records, notes, reports, information[,] and recordings relating to interviews and investigations of allegations involving [Norling] and [Mathis] . . . for the time period of January 1st through August 30th, 2018, including[,] but not limited to, notes and recordings of interviews with the three children involved in the relationship between [Norling] and [Mathis] during the time period in question regarding alleged child sexual abuse by [Mathis].

On July 16, 2019, the court issued an Order which granted Mathis's subpoena, adopted the above language verbatim to articulate the scope of the subpoena, and ordered the Child and

6

Family Services Division (CFS) to lodge this evidence with the court (July 2019 Order). In its effort to comply with the July 2019 Order, CFS mailed the court a physical case file which the court noted contained "151 pages of information." After completing its review of the CFS file, the court issued its August 9, 2019 Order holding that the entire file should be provided to Mathis (August 2019 Order). The August 2019 Order reasoned that "[t]here is information contained in the documents which relates to these charges. Furthermore, the Defendant is facing the possibility of being incarcerated for the remainder of her life. . . . This is information to which she is entitled." The CFS file was subsequently provided to Mathis. However, as noted by Mathis on appeal, this file did not contain the forensic interviews of J.M. and T.N. that were conducted in association with Norling's criminal case.[2] Mathis, however, made no objection or otherwise brought to the District Court's attention that these forensic interviews were never lodged with the court. Thus, Mathis asserts on appeal that "records of T.N.'s and J.M.'s forensic interviews conducted in connection with Norling's arrest" were never lodged with the court by either CFS or the State, and the State does not contest the fact that these interviews from Norling's case were never provided to Mathis during discovery.[3]

---

[2] For the sake of clarity, we note that on appeal Mathis is silent as to whether she also failed to receive from DPHHS the March 2018 interview with N.M. that was conducted in connection with Norling's case. Instead, Mathis's appeal focuses its argument around her failure to receive only T.N.'s and J.M.'s forensic interviews from early 2018.

[3] Mathis's appeal exclusively faults the prosecution—not DPHHS—for failing to produce T.N. and J.M.'s 2018 forensic interviews in the Norling matter. Mathis notes in her reply brief that because "DPHHS is not a criminal justice agency," it "likely did not have the forensic interviews and thus could not include them when responding to the subpoena." Although the State does not

¶11 Mathis's trial was originally scheduled for October 28, 2019. However, on October 15, 2019—less than two weeks before trial—Mathis filed a "Motion for Order Allowing Interview of Child Witness." Mathis averred that she had "diligently sought" to conduct pretrial interviews of both T.N. and J.M. through "formal and informal discovery requests"; however, T.N. and J.M. had both declined to be interviewed.[4] As a result, Mathis's October 2019 motion sought a court order which would permit Mathis's counsel to conduct pretrial interviews with both T.N. and J.M. pursuant to § 46-15-320, MCA, which provides that sexual abuse victims under the age of 16 may be ordered by a court to conduct pretrial interviews with the defendant/defendant's counsel only upon a showing of "exceptional circumstances" by the defendant. Mathis argued her need to interview the children outweighed the State's interest in protecting them. In particular, Mathis asserted that these pretrial interviews were necessary to demonstrate T.N. was lying about the abuse allegations as a form of retribution for Mathis's assistance in the prosecution of T.N.'s father, Norling.[5] Additionally, Mathis maintained the July 2018 forensic interview with T.N. and J.M.'s July 2018 counseling records—along with all other documents which had

deny that it had these interviews in its possession, this Court was not able to independently confirm whether or not CFS also had access to these interviews.

[4] Specifically, Mathis's October 2019 motion stated that Mathis had "diligently sought access to both [T.N.] and [J.M.] for pretrial interviews. . . . To date, all requests have been denied." On appeal, Mathis does not challenge the State's contention that T.N. and J.M. each denied the request of Mathis's counsel to interview them in advance of Mathis filing her October 2019 motion.

[5] An alternative theory of defense presented by Mathis's October 2019 motion also posited that it was actually Norling, not Mathis, who "encouraged" T.N. to touch Mathis's breasts and that Mathis rejected Norling's suggestion.

thus far been provided to the defense—failed to "provide [enough] clarity as to the exact nature of [T.N.'s] allegations." As a result, Mathis argued she had a due process right to access witnesses which permitted her to conduct pretrial interviews with both children. Lastly, Mathis argued § 46-15-320, MCA, was facially unconstitutional on due process grounds, as well as unconstitutional as-applied to her case.

¶12 The State opposed Mathis's motion, arguing § 46-15-320, MCA, was constitutional as follows:

> [C]urrent research in the field of sexual abuse, past testimony by expert witnesses in the field of child-maltreatment, and past testimony by counselors involved in treating children who have been sexually abused, indicates that every time a child is made to talk about sexual abuse, it can further the trauma they have already experienced. This is one of the reasons the Montana Legislature enacted . . . Mont. Code Ann. § 46-15-320—to protect the most vulnerable among us, absent exceptional circumstances.

The State also claimed that Mathis had not met § 46-15-320, MCA's burden of showing "exceptional circumstances" existed which necessitated a court order for interviews with either T.N. or J.M. The State also noted that a forensic interview of J.M. had been scheduled in the near future and that J.M. would be questioned about the specifics of her allegations against Mathis during this interview. The record shows that this subsequent forensic interview with J.M. was conducted in late 2019, and it was provided to Mathis and the State.

¶13 The court delayed Mathis's trial and held an evidentiary hearing on December 2, 2019, to consider Mathis's request for pretrial interviews of T.N. and J.M. under § 46-15-320, MCA. J.M.'s former counselor, Kelli Berg (Berg), testified at the hearing.

9

Although Berg had not conducted counseling sessions with J.M. "in [the past] 6 months," she nevertheless offered her professional opinions that J.M. "should be allowed space to heal" and that "conducting another interview at this stage would be detrimental to [J.M.]." The District Court denied Mathis's request, concluding Mathis had not met her burden under § 46-15-320, MCA, of demonstrating "exceptional circumstances" existed to interview the children. The District Court noted that two forensic interviews of T.N. and J.M. had already been conducted to investigate the charges against Mathis and that each interview had been provided to Mathis. While the District Court noted that § 46-15-320, MCA, could pose potential constitutional questions, it declined to entertain Mathis's constitutional challenges and held it would "enforce the statute as intended by the Legislature."

### c. Trial & Sentencing

¶14 Mathis's trial was held on January 27-30, 2020. The State called multiple witnesses, including T.N., J.M., and Norling. T.N. was thirteen years old at the time of Mathis's trial, and he testified in detail regarding three specific instances where he had touched Mathis's breasts. T.N. also testified that, in addition to these three specific instances, there were at least one or two other occasions where Mathis had made him touch her breasts that he could not recall the specific details of. In general, T.N. noted that he preferred to think about these events involving Mathis as little as possible "[b]ecause it brings back memories" which he did not "want to be stressed about." In describing the anxiety that

10

thinking about these events causes him, T.N. stated "[i]t's just a thing that happens and your body is stressed about it and there is nothing you can do to stop it."

¶15     The first incident T.N. described occurred on a Friday "movie night" at the family residence, during which Mathis walked over to T.N. in the family's living room while she was wearing nothing other than a robe. T.N. testified Mathis opened the top part of her "sea green color[ed]" robe, revealing her bare breasts, and hugged T.N., purposefully pressing her breasts into his face. T.N. stated that, at the time of this incident, he had just begun puberty and his "private parts did get hard." Next, T.N. recounted a second incident during a different "movie night" where T.N. was working on a puzzle during the movie. According to T.N., Mathis offered to help him with the puzzle, but then displayed her breasts to him once again. T.N. claimed that Mathis "made me place my hands on them" and "laugh[ed] while I had my hands on her breasts[.]" T.N. also recounted a third incident, which again occurred at the family home, during which Mathis was wearing a "laced white bra" and had him touch her breasts over her bra while she was "ironing clothes like she usually did." During cross-examination, T.N. stated that he had seen Mathis walk around the house naked or half-naked "between 5 and 10" times—consistent with T.N.'s statement from his July 2018 forensic interview that Mathis would frequently walk around the house "in just a bra and underwear, or just in her underwear." Overall, T.N. stated that he believed he had touched his stepmother's breasts a total of three or four times—"twice with the bare [breasts] and like once or twice with the bra [on]."

11

¶16   J.M.—who was ten years old at the time of Mathis's trial—also testified that she had witnessed Mathis let T.N. touch her breasts on at least two separate occasions. J.M. stated that on one occasion, she saw Mathis and T.N. standing in the doorway between the kitchen and the living room in their home with T.N. touching Mathis "under the bra and stuff." When asked to describe Mathis's behavior during this incident, J.M. stated that "[m]om had been drinking a lot so she was kind of just like [sic] she was laughing and . . . acting silly, I guess." When J.M. was questioned about the second incident, she replied that she could not remember precisely "where it happened," but noted that it occurred in the house and that "it happened the same way[—]him touching her under the bra." When asked how she remembered it to be at least two incidents, J.M. replied that "I . . . remember it happened [twice] because I remember two different colors of bra." Lastly, when asked how she knew this last incident had actually occurred, J.M. replied directly "[b]ecause I saw it happen."

¶17   Norling testified that both he and Mathis drank alcohol together on a "nightly" basis around the children, and that they typically drank to the point of "impairment." Norling also testified that he recalled an incident where Mathis told him that she let T.N. feel her breasts and that T.N. "liked" to touch her breasts. Norling also claimed that he witnessed Mathis hug T.N. while Mathis was wearing a bathrobe and that, while Mathis's full breasts were not exposed, she "buried [T.N.'s] face in her breasts" and "cleavage." This was the only incident that Norling claimed to have witnessed directly.

¶18 Overall, T.N.'s testimony described no fewer than three specific instances of abuse by Mathis, while J.M.'s testimony described at least two instances of abuse she had witnessed. However, at the close of testimony, it became apparent that the children's testimony had largely failed to clarify the specific calendar year during which each instance of abuse had occurred. Norling's testimony established the incident he observed occurred when T.N. was "probably 10 or 11."

¶19 The jury was provided with the following jury instructions regarding Count I and Count II:

> Each count charges a distinct offense. You must decide each count separately. The Defendant may be found guilty or not guilty of any or all of the offenses charged.
>
> .   .   .
>
> Defendant is charged with two separate and distinct offenses: Count I: Incest and Count II: Incest. You must decide each count separately and you should not use evidence of guilt from one offense as evidence of guilt on the other alleged offenses. Nor should you find the defendant guilty based upon a finding that the defendant has a propensity to commit any type of offense simply because there are multiple charges. The defendant may be found either guilty or not guilty on some or all of the offenses charged. The State, however, must overcome defendant's presumption of innocence with proof beyond a reasonable doubt on each charge separately. Your finding as to each count must be stated in a separate verdict, and each separate verdict must be unanimous.

Notably, no "specific-act unanimity" instruction was requested by Mathis and none was provided to the jury. Mathis offered no objection to the jury instructions. During jury deliberations, the jury sent the District Court a note which asked "[w]hy are the charges separated into 2 counts?" With each parties' agreement, the District Court replied only that "[e]ach count alleges a separate criminal offense." Notably, this response failed to

13

offer any insight as to why the State chose to keep the charges against Mathis separated into two distinct time periods—Count I being the time between December 2016 and December 2017, when T.N. was ten years old, and Count II being the time between December 2017 and March 2018, when T.N. was eleven. The jury returned a verdict which convicted Mathis on Count I of incest committed during the time period between December 2016 and December 2017, and acquitted Mathis on Count II of incest for the three-month time period between December 2017 and March 2018.

¶20 On June 26, 2020, the District Court sentenced Mathis to 100 years in prison with 90 years suspended. Mathis now appeals her conviction for incest and requests a new trial based on several separate allegations of error.

## STANDARDS OF REVIEW

¶21 This Court's review of constitutional questions, including questions which implicate a criminal defendant's right to due process, is plenary. *State v. Villanueva*, 2021 MT 277, ¶ 23, 406 Mont. 149, 497 P.3d 586 (citations omitted). "Legislative enactments are presumed to be constitutional[,]" and "[t]he party challenging a statute has the burden of proving beyond a reasonable doubt that it is unconstitutional." *In re S.M.*, 2017 MT 244, ¶ 10, 389 Mont. 28, 403 P.3d 324 (citing *Williams v. Bd. of Cnty. Comm'rs of Missoula Cnty.*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88). "To prevail on a facial challenge, the party making the challenge must show that 'no set of circumstances exists' under which the statute would be valid or that the statute lacks any 'plainly legitimate sweep.'" *In re*

14

*S.M.*, ¶ 10 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008) (additional citations omitted)).

¶22   "A district court's discretionary rulings, including whether to grant or deny discovery, are reviewed for an abuse of discretion." *State v. Soto*, 2020 MT 265, ¶ 8, 401 Mont. 545, 474 P.3d 815 (citations omitted). "The test for abuse of discretion is whether the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason." *Soto*, ¶ 8 (quoting *State v. Ayers*, 2003 MT 114, ¶ 26, 315 Mont. 395, 68 P.3d 768).

¶23   If a defendant had the opportunity to object to a jury instruction at trial but failed to do so, we will ordinarily not examine the issue unless it qualifies for plain error review. *State v. Birthmark*, 2013 MT 86, ¶ 11, 369 Mont. 413, 300 P.3d 1140. "Plain error review is used sparingly and only in situations that implicate a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Birthmark*, ¶ 11 (citing *State v. Main*, 2011 MT 123, ¶ 53, 360 Mont. 470, 255 P.3d 1240).

**DISCUSSION**

¶24   *Whether the District Court correctly denied Mathis's motion to interview T.N. and J.M.?*

¶25   Under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution—and the Due Process Clause of Article II, Section 17 of the Montana Constitution, whose language mirrors that of its federal counterpart—a criminal defendant must be given "a meaningful opportunity to present a complete defense." *Villanueva*, ¶ 23

15

(citing *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984)). This due process right to present a complete defense encompasses an area of law that "might loosely be called the area of constitutionally guaranteed access to evidence." *State v. Fisher*, 2021 MT 255, ¶ 27, 405 Mont. 498, 496 P.3d 561 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 3446 (1982)). In general, discussions in this area of law commonly focus on the State's affirmative duty to preserve and provide criminal defendants with exculpatory evidence, as established by *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). *See State v. Jeffries*, 2018 MT 17, ¶¶ 15-16, 390 Mont. 189, 410 P.3d 972; *Villanueva*, ¶ 23. We have held that, under a defendant's right to present a complete defense, "the State cannot deny defendant's counsel access to a material witness." *State v. Smith*, 206 Mont. 99, 108, 670 P.2d 96, 100-01 (1983). *See also State v. Pecora*, 190 Mont. 115, 121, 619 P.2d 173, 176 (1980).

¶26 Relying upon *Smith* and *Pecora*, Mathis argues that § 46-15-320, MCA, is unconstitutional—both facially and as-applied to the facts of her case—because it purportedly violated her "right to access witnesses" by preventing her from conducting pretrial interviews with T.N. and J.M. However, because T.N. and J.M. declined to be interviewed by the defense, Mathis's as-applied constitutional challenge to § 46-15-320, MCA, necessarily fails. Furthermore, we conclude that we need not address the merits of Mathis's facial challenge to § 46-15-320, MCA, as her facial challenge necessarily fails alongside her as-applied challenge. *See In re S.M.*, ¶ 10 ("To prevail on a facial challenge,

16

the party making the challenge must show that no set of circumstances exists under which the statute would be valid . . .").

¶27 Section 46-15-320, MCA, provides:

> (1) A defendant may not interview a child under the age of 16 who alleges to be the victim of sexual abuse . . . or an immediate family member of the child who is also under the age of 16, except by an order of the court upon a motion showing that the defendant has exceptional circumstances that necessitate interviewing the child victim.
> (2) Upon a motion under subsection (1), the court may, in its discretion, order an interview. If the court orders an interview, the court shall list the reasons for and scope of the interview and, if requested, provide any reasonable accommodations for the child victim for the interview.

On appeal, Mathis argues "§ 46-15-320[, MCA,] is unconstitutional as applied" to her because the statute placed a burden on her to establish there were "exceptional circumstances" to conduct interviews of J.M. and T.N. According to Mathis, her opportunity to access these witnesses "was obstructed by government policy." However, Mathis's argument here presupposes that, under her "right to access witnesses," she was *entitled* to pretrial interviews with T.N. and J.M. Mathis's argument also presupposes that, were it not for the requirement that exceptional circumstances be demonstrated under § 46-15-320, MCA, the defense would have secured interviews with both children. Neither of Mathis's assumptions, however, are true.

¶28 The record in Mathis's case is clear that, before Mathis filed her October 2019 motion with the Court to obtain pretrial interviews with T.N. and J.M., Mathis's counsel had already "diligently" requested the opportunity to conduct pretrial interviews with both children. However, T.N. and J.M. each separately *declined* the defense's request to

17

conduct these pretrial interviews. Moreover, although this Court has never directly addressed this precise issue, there is persuasive authority holding that T.N. and J.M. had a *right to decline* an interview with Mathis's counsel under these circumstances. Indeed, federal circuit courts have persuasively—and consistently—characterized "a defendant's right of access to a witness" as one that "'exists co-equally with the witnesses right to refuse to say anything'" to the defense pretrial. *United States v. Black*, 767 F.2d 1334, 1338 (9th Cir. 1985) (quoting *United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir. 1977)) (additional citations omitted). Thus, a "defendant's right of access [to a witness] is not violated when [that] witness chooses voluntarily not to be interviewed." *Black*, 767 F.2d at 1338 (citing both *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir. 1985) and *United States v. Bittner*, 728 F.2d 1038, 1041 (8th Cir. 1984)). Therefore, Mathis was not going to receive pretrial interviews with either T.N. or J.M. regardless of § 46-15-320, MCA. Both children had declined interviews with Mathis. Mathis's due process "right to access witnesses" did not include compelling a pretrial interview under the circumstances.

¶29 Moreover, for a court to find a violation of a defendant's "right to access witnesses" during the pretrial process there must be some sort of *affirmative act by the prosecution* which interfered with the defense's access to witnesses. *See Pecora*, 190 Mont. at 121, 619 P.2d at 176 (characterizing a defendant's right of access to witnesses as one that prevents "the prosecution" from taking action to "sequester [and] insulate witnesses from the defense on [the prosecution's] own initiative"); *State v. Smith*, 235 Mont. 99, 103, 765 P.2d 742 (1988) ("[N]either party should obstruct the other party's access to witnesses.").

18

*See also United States v. Pepe*, 747 F.2d 632, 654 (11th Cir. 1984) (surveying federal case law regarding the right to access witnesses and concluding that "in most cases in which the court has found a constitutional violation, prosecutors have hidden witnesses or deliberately disobeyed court orders to produce for examination witnesses under governmental control."). Here, there is no record or assertion that the prosecution exerted any inappropriate influence on J.M. and T.N.'s respective decisions to decline an interview. The children, who were going to testify at Mathis's trial, refused to engage in more pretrial interviews in addition to those they had already given—a decision which was theirs to make. *See Black*, 767 F.2d at 1338. As a result, Mathis's constitutional challenge fails.

¶30 *2. Whether the State's failure to lodge with the District Court forensic interviews from a different case violated Mathis's right to a fair trial?*

¶31 Mathis argues the State's failure to lodge with the District Court T.N.'s April 2018 forensic interview conducted in association with Norling's criminal case violated her due process right to receive exculpatory evidence.[6]

¶32 Our review of the record indicates that Mathis made two pretrial requests for all "forensic interviews" related to Norling's case: (1) Mathis's December 2018 motion to

---

[6] Mathis's appeal also asserts that her failure to receive the March 2018 forensic interview with J.M.—which was also conducted in association with Norling's case—violated her right to receive exculpatory evidence. However, outside of this assertion, Mathis's appeal does not even contain a cursory argument as to why the forensic interview with J.M. in Norling's case is "potentially exculpatory." Instead, Mathis only argues that T.N.'s April 2018 interview was potentially exculpatory in nature, due to its potential to impeach T.N.'s testimony. As we have previously noted, under M. R. App. P. 12(1), this Court is not obligated to develop arguments on behalf of an appellant who fails to do so. *See State v. Whalen*, 2013 MT 26, ¶ 35, 368 Mont. 354, 295 P.3d 1055. As a result, we will only address Mathis's contention regarding the April 2018 interview with T.N.

19

compel production of CCJI from Norling's case, and (2) Mathis's June 2019 motion to subpoena DPHHS for evidence related to Norling's case. In response to both motions, the District Court ordered that evidence should first be lodged with the court for in-camera review and ultimately provided Mathis with all lodged documents pursuant to both requests. Notwithstanding, neither the prosecution nor DPHHS ever lodged T.N.'s April 2018 forensic interview with the court.

¶33    Mathis argues that the prosecution is at fault because it failed to lodge T.N.'s April 2018 interview with the court following the March 2019 Order requiring the State to lodge all "exculpatory evidence" for in-camera review. Mathis asserts that the March 2019 Order's language impliedly required the State to lodge T.N.'s April 2018 interview with the court. Conversely, the State argues that the text of the Order was vague and did not require the State to lodge this interview, particularly after the State indicated T.N. did not allege any abuse by Mathis or Norling during the interview and the District Court acknowledged the existence of T.N.'s April 2018 interview in the order itself. The State also argues that Mathis did not object upon learning that the State had not lodged this forensic interview.[7] The record in these proceedings has been difficult to review because of imprecise objections, imprecise pleadings and orders, overlapping evidence from two

---

[7] The State also argues that Mathis waived this argument on appeal because she failed to raise an objection before the trial court on three separate occasions—first, upon learning that the State had not lodged T.N.'s April 2018 forensic interview with the Court; second, upon learning that CFS had also not lodged this interview; and, finally, at trial. We need not address the State's contention regarding plain error, because our decision that disclosure of the April 2018 interview would not have affected the outcome of the trial is dispositive.

20

different cases, and the amount and type of pretrial discovery that was amassed. However, what is clear from the record is the following: the State represented to defense counsel and the court that T.N.'s April 2018 interview made no disclosures of sexual abuse by anyone against T.N., J.M., or N.M., including Norling; Mathis never contested this fact; the District Court's March 2019 Order, presumably accepting the State's uncontested representations about the contents of the April 2018 interview, found that during the course of the interview "[T.N.] did not make any disclosures about any abuse to himself, to [N.M.], or to [J.M.]"; and Mathis at trial and on appeal never offers any other reason for wanting the interview other than its impeachment value based on the lack of any disclosures by T.N. Based on this record, all parties involved in the trial, including the District Court, accepted that the exculpatory value of the interview was in T.N.'s failure to make any disclosures of sexual abuse. Accordingly, we remain focused on the issue at hand: whether Mathis is entitled to a new trial because she never received an interview of T.N. conducted pursuant to Norling's criminal proceeding where T.N. made no mention of abuse by Mathis.[8]

---

[8] Referring to *State v. Johnston*, 2014 MT 329, 377 Mont. 291, 339 P.3d 829, and *State v. Little*, 260 Mont. 460, 861 P.2d 154 (1993), the Dissent faults the Court for "depart[ing] from this established precedent, . . . without attempting to distinguish it." Dissent, ¶ ___. In both *Johnston* and *Little*, the court *refused* to conduct an in camera review of confidential records following a motion to compel filed by defense counsel. Here, the District Court conducted an in camera review of confidential information. After setting forth in its order what it believed the contents of the April 2018 interview contained, it ordered all confidential information released to Mathis. In *Little* and *Johnston*, there was error by the court in failing to conduct the in camera review. The District Court here followed the proper procedure and any deficiencies in production could have been brought to the District Court's attention. Moreover, other than a passing one-sentence statement made in the alternative by Mathis in her opening brief and another passing one-sentence statement made in a footnote in her reply brief, neither of which directed this Court to any authority, Mathis has failed to adequately support her request for remand. It is apparent that Mathis seeks a reversal for alleged misconduct of the State in failing to lodge certain discovery with the District Court, not that she really questions what is contained in the interview.

¶34    A criminal defendant's due process rights include the right to receive potentially exculpatory evidence from the State during discovery. *See, e.g.*, *State v. Stutzman*, 2017 MT 169, ¶ 28, 388 Mont. 133, 398 P.3d 265 (citation omitted). *See also Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97. When determining whether to grant a new trial based on the failure to produce potentially exculpatory evidence, this Court has established a two-part inquiry which asks: (1) whether the evidence in question is "favorable to the defense," and (2) whether there is a "reasonable probability" that the evidence "could have affected the outcome of the proceedings" such that "the result would have been different." *Stutzman*, ¶¶ 28-29 (citing both *State v. Weisbarth*, 2016 MT 214, ¶ 24, 384 Mont. 424, 378 P.3d 1195 and *State v. Ellenburg*, 2000 MT 232, ¶ 47, 301 Mont. 289, 8 P.3d 801) (additional citations omitted). We note that the test is in the conjunctive. Under *Stutzman*'s first prong, evidence that is "favorable to the defense" is that which "has the 'potential to lead directly to admissible exculpatory evidence.'" *Stutzman*, ¶ 28 (quoting *Weisbarth*, ¶ 24). Under *Stutzman*'s second prong, to mandate reversal of the conviction, a defendant must prove "that there is a reasonable probability that had the information been provided, the result would have been different or, stated another way," this second prong asks whether, based on the record in a particular case, the existing verdict is a "verdict worthy of confidence." *Stutzman*, ¶ 29 (quoting *Ellenburg*, ¶ 47) (additional citation omitted).

¶35    With respect to *Stutzman*'s first prong, Mathis argues that T.N.'s April 2018 forensic interview conducted during the investigation of Norling is potentially "favorable to [her] defense" because it could help prove the defense's theory that T.N. was lying about Mathis

22

sexually abusing him in retribution for Mathis's assistance in his father's prosecution. Specifically, based on the State's uncontested statement in its January 2019 motion that "[T.N.] did not disclose any sexual abuse" by Mathis during the April 2018 forensic interview, Mathis argues that the interview would have impeached T.N.'s trial testimony, as T.N. at trial testified that Mathis had abused him.[9] The State maintained that T.N. was not specifically asked about Mathis during this interview because "the focus of the interview pertained specifically to [Norling's] actions[.]" Nevertheless, the State also conceded in this same motion that "an argument could be made that the [April 2018] forensic interview of [T.N.] is exculpatory," citing the same impeachment rationale that Mathis's appeal now argues. We accept for purposes of our analysis that T.N.'s April 2018 interview satisfies *Stutzman*'s first prong as evidence that was likely "favorable" to the defense. We turn now to whether there is a "reasonable probability" that the evidence "could have affected the outcome of the proceedings" such that "the result would have been different." *Stutzman*, ¶¶ 28-29.

---

[9] Mathis does not contest State's claim that T.N. did not discuss any abuse by Mathis during his April 2018 forensic interview. Nevertheless, Mathis's appeal also asserts that T.N.'s April 2018 forensic interview is exculpatory impeachment evidence because, during his trial testimony, T.N. appears to have lied and claimed that he revealed Mathis's abuse to investigators during his April 2018 forensic interview. However, in the particular portion of the trial transcript cited by Mathis it is just as likely that T.N. misspoke out of confusion and was actually recounting the events of his *July* 2018 forensic interview where he first disclosed Mathis's abuse to investigators. In the portion of the transcript that immediately follows this statement, T.N. openly claims that it was "hard [for him] to remember" the specific details of his forensic interviews due to the passage of time.

23

¶36    In *Stutzman*, this Court noted that even when evidence not received by the defense is deemed favorable to the defense, a conviction should not be reversed when the factual record indicates the disclosure "would not have affected the outcome of the proceedings." *Stutzman*, ¶¶ 30-31. We refused to reverse Stutzman's sexual assault conviction for abusing his girlfriend's minor child even though the prosecution failed to disclose notes from the child's group therapy session which indicated that the child harbored negative feelings towards Stutzman. *Stutzman*, ¶ 35. Stutzman argued that he could have used this evidence to impeach the child's testimony more effectively at trial. Although we viewed the notes in *Stutzman* as "potentially favorable evidence for the defense" which "should have been disclosed," we held that disclosure of the notes would not have affected the trial's outcome based "[o]n the strength of the record as a whole." *Stutzman*, ¶ 35. More specifically, we noted that the record indicated that Stutzman's counsel, even without the group therapy notes, received "ample opportunities" to offer Stutzman's theory of impeachment during trial. *Stutzman*, ¶ 35. In *Stutzman*, the child's detailed, credible testimony—which described at least two specific instances of sexual assault by Stutzman—resulted in a "verdict worthy of confidence." *Stutzman*, ¶¶ 5, 36.

¶37    Here, Mathis's contention is similar to Stutzman's claim regarding the value of the child's group therapy notes. Mathis argues that she would have been able to use the absence of any allegations of abuse in T.N.'s April 2018 forensic interview to impeach T.N.'s trial testimony. Such a contention, however, fails against the "strength of the record [against Mathis] as a whole." *Stutzman*, ¶ 35. First, T.N. presented credible testimony of

three specific instances of sexual abuse by Mathis—"twice with the bare [breasts] and [] once . . . with the bra [on]." Second, T.N.'s testimony was reinforced by testimony from T.N.'s stepsister and Mathis's daughter, J.M. Most notably, J.M. testified that she had personally witnessed two separate instances where T.N. had touched her mother "under the bra"—incidents which J.M. knew were distinct because she recalled her mother wearing "two different colors of bra" on each occasion. Furthermore, T.N.'s April 2018 forensic interview would have done little to advance Mathis's speculative and underdeveloped theories of why J.M. would lie about observing T.N.'s abuse. Third, T.N. was never directly questioned about Mathis's abuse during T.N.'s April 2018 forensic interview because the abuse was not disclosed until J.M. made her disclosures in July of 2018 to her counselor. Additionally, T.N. testified that when the April 2018 interview was conducted as part of the investigation of Norling, he did not want to make any disclosures which would get his father into trouble. Thus, the value of T.N.'s April 2018 interview to impeach T.N.'s trial testimony is minimal at best and is not likely to have "affected the outcome" of Mathis's trial. *Stutzman*, ¶ 28. Fourth, Mathis was able to impeach T.N.'s trial testimony through other witnesses in a manner similar to how the April 2018 interview could have been used for impeachment. Specifically, T.N. testified that he disclosed Mathis's abuse to his best friend, C.G.—with whom he shared everything and "never hid any secrets"—and his grandmother, Mary Jo Morgan (Morgan). However, Mathis questioned C.G. and Morgan at length and both were clear that T.N. never told them Mathis had sexually abused him, or that she had walked around the house without clothes on, or

25

that she had T.N. touch her breasts. Additionally, Mathis could also have called the forensic interviewer as a witness and impeached T.N. through the interviewer's testimony.

¶38 Finally, we cannot ignore that Mathis herself did not view T.N.'s April 2018 forensic interview as important to her defense. Mathis, even after knowing the interview had not been lodged, never contested the District Court's finding in its March 2019 Order that during the interview T.N. did not make any disclosures of sexual abuse. That Mathis failed to raise any objection to the District Court upon learning the State had not lodged T.N.'s April 2018 interview calls into question Mathis's present claim that her receipt of this interview was crucial to her defense team's trial strategy. Mathis's defense team had "ample opportunity" to pursue production of the interview but failed to do so. *Stutzman*, ¶ 35. Mathis's team failed to pursue discovery of T.N.'s interview on *three* separate occasions: first, when the State did not lodge the interview in response to the court's March 2019 Order; second, when it was not produced pursuant to the subpoenas to DPHHS; and, lastly, during trial. In addition to a pretrial conference and trial, there were multiple hearings on motions and status conferences where no mention was made of the failure to lodge the interview with the court. Mathis now argues on appeal that the interview was critical to her defense, so critical that she deserves a new trial. We are not so convinced.

¶39 We conclude T.N.'s April 2018 interview is not the type of evidence that could have "affected the outcome" of Mathis's trial. *Stutzman*, ¶ 28. Instead, the strength of the evidence indicates that the jury's verdict was a "verdict worthy of confidence"—even

though Mathis never received T.N.'s April 2018 interview. *Stutzman*, ¶ 29. As a result, Mathis is not entitled to a new trial on these grounds.

¶40     *3. Whether this Court should exercise plain error review to consider if the District Court should have given a specific unanimity instruction?*

¶41     Mathis argues she is entitled to a new trial due to the District Court's alleged violation of her right to a unanimous verdict because it failed to sua sponte issue a "specific-act unanimity" instruction to the jury.[10] Mathis relies on *State v. Weaver*, 1998 MT 167, 290 Mont. 58, 964 P.2d 713, to argue it was unclear which specific instance of incest the jury convicted Mathis of for the time period of December 2016 through December 2017. Mathis argues that, without a specific-act unanimity instruction, the jurors may not have unanimously agreed on one specific instance of abuse when convicting Mathis. As a result, Mathis contends that the District Court should have provided a specific-act unanimity instruction to the jury using the following language: "in order to find the defendant guilty, you must unanimously agree on the commission of the same specific act [or acts]." Mathis acknowledges that the defense failed to propose this jury instruction and did not raise any objection to the jury instructions at the trial. As a result, Mathis now asks this Court to invoke plain error review in order to reverse her conviction on this ground.

---

[10] Mathis's appeal also argues that her counsel's failure to request a specific-act unanimity instruction constituted ineffective assistance of counsel (IAC). This claim is not appropriate on direct appeal because the record does not support an explanation of why counsel failed to request the instruction. *State v. Gallagher*, 2005 MT 336, ¶ 23, 330 Mont. 65, 125 P.3d 1141.

¶42 Section 46-20-104(2), MCA, establishes the general rule that a party's "[f]ailure to make a timely objection during trial constitutes a waiver of the objection except as provided in § 46-20-701(2), MCA." The Montana code also contains a more specific version of § 46-20-104(2), MCA, which applies in the context of unpreserved errors related to jury instructions. Section 46-16-410(3), MCA, provides that "[a] party may not assign as error any portion of the instructions or omission from the instructions unless an objection was made specifically stating the matter objected to, and the grounds for the objection, at the settlement of instructions." Section 46-20-701(2), MCA, lists exceptions to the aforementioned statutes, but makes clear that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Mathis's appeal does not assert any of the exceptions contained in § 46-20-701(2), MCA. Thus, pursuant to these statutes, her appeal is barred. Mathis therefore urges this Court to invoke the common law doctrine of plain error review.

¶43 Mathis alleges that the failure to give a specific-act unanimity instruction prejudiced her constitutional right to a unanimous verdict. Because Mathis has requested plain error review, her burden on appeal is heavy. Successful challenges utilizing plain error review remain rare. *See State v. Wilson*, 2007 MT 327, ¶¶ 36-39, 340 Mont. 191, 172 P.3d 1264 (citing § 46-20-104(2) and declining to exercise plain error review of a defendant's unpreserved request for a specific unanimity instruction); *see also Birthmark*, ¶¶ 9, 20-21 (holding that, where a defendant had the opportunity to object to a jury instruction at trial but failed to do so, plain error review was not warranted). Overall, "[p]lain error review is

28

used sparingly and only in situations that implicate a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Birthmark*, ¶ 11 (citation omitted).

¶44 This Court reviews jury instructions in a criminal case to determine "whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Crawford*, 2002 MT 117, ¶ 15, 310 Mont. 18, 48 P.3d 706 (citation omitted). Additionally, under both the U.S. Constitution and the Montana Constitution, criminal defendants have the constitutional right to receive a unanimous verdict. *See Ramos v. Louisiana*, 590 U.S. ___, 140 S. Ct. 1390, 1397 (citing U.S. Const. amend. VI, XIV); *State v. Wells*, 2021 MT 103, ¶ 15, 404 Mont. 105, 485 P.3d 1220 (citing Mont. Const. art. II, § 26). Included within a criminal defendant's right to a unanimous verdict is the right to what is known as a "specific[-act] unanimity instruction" in select criminal cases. *Wells*, ¶ 20. In cases where the prosecution "alleges multiple unlawful acts under a single count, a judge may be required to instruct the jury on 'its duty to unanimously agree to a particular set of facts' so as to prevent the possibility of a conviction resulting from 'different jurors concluding that the defendant committed different acts.'" *Wells*, ¶ 20 (quoting *Weaver*, ¶ 34). A specific-act unanimity instruction is one that instructs the jury that "in order to find the defendant guilty, [the jury] must unanimously agree upon the commission of the same specific act [or acts]." *Weaver*, ¶ 39. Our inquiry into whether a specific-act unanimity instruction is necessary is guided by the question of whether the instruction was needed to avoid juror confusion about the charges or to avoid juror ignorance regarding the

application of the law in question. *See Weaver*, ¶ 34; *State v. Vernes*, 2006 MT 32, ¶ 23, 331 Mont. 129, 130 P.3d 169. Stated differently, "[w]hen a genuine possibility exists that different jurors will conclude a defendant committed disparate illegal acts subsumed under [a] single count, the special instruction serves to direct the jurors to reach a unanimous verdict on at least one specific criminal act before finding guilt for the multiple-act count." *State v. Harris*, 2001 MT 231, ¶ 12, 306 Mont. 525, 36 P.3d 372 (abrogated on grounds unrelated to specific unanimity by *Robinson v. State*, 2010 MT 108, ¶ 12 n.1, 356 Mont. 282, 232 P.3d 403).

¶45    In *Weaver*, this Court exercised plain error review and held that a district court was required to provide a specific-act unanimity instruction to ensure the jury was in unanimous agreement with respect to the occurrence of at least one specific act of sexual assault when evidence was presented of multiple, unrelated allegations of sexual misconduct against two victims over the span of two separate time periods. *Weaver*, ¶ 36. The abuse of the first victim in *Weaver* occurred intermittently over the span of five years, while the abuse of the second victim occurred sporadically over the span of six months. *Weaver*, ¶ 36. On appeal, Mathis argues that *Weaver* must be applied to reverse her conviction for incest. Yet, in the time since *Weaver*, this Court has considered other cases similar to the one here and refused to exercise plain error review to reverse a District Court's failure to issue a specific-act unanimity instruction. *See State v. Gallagher*, 2005 MT 336, ¶¶ 18-21, 330 Mont. 65, 125 P.3d 1141 (holding that "[a]lthough a specific unanimity instruction may well have been appropriate in this case, we cannot conclude from the circumstances that the omission

compels the exercise of plain error review . . . [b]ased on the evidence and testimony presented at trial[.]"); *Wilson*, ¶¶ 35-40 (upholding a defendant's conviction for evidence-tampering when no specific-act unanimity instruction was offered, even though this resulted in a scenario where "some members of the jury might have convicted [Wilson] of tampering with [a] gun" while others "might have convicted her of tampering with [a] car"); *Wells*, ¶ 21 (holding that there must be "a limit to the level of specificity to which . . . a jury [is] required to converge upon in reaching a single understanding of events"); *Harris*, ¶¶ 11-15. Thus, since *Weaver*, this Court has determined on multiple occasions that in cases where a specific-act unanimity instruction might be applicable, we may still decline to review this issue under the plain error doctrine based on the specific facts of a case. *See Harris*, ¶¶ 11-15; *Gallagher*, ¶¶ 18-21. This Court "employ[s] the plain error doctrine sparingly, on a case-by-case basis, considering 'the totality of circumstances of each case.'" *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854.

¶46 We have also delineated an important exception to the necessity of a specific-act unanimity instruction—known as the "continuous course of conduct" exception—which can be applied when a defendant's allegedly wrongful conduct under a single criminal count consists of a series of several different acts. *Wells*, ¶¶ 22-23. Under this "continuous course of conduct" exception, the "key inquiry" involves "determining whether multiple acts or material facts alleged under a single count require a specific unanimity instruction [by asking] whether the acts are so closely related in time, location, and nature that they

31

form part of the same transaction or course of conduct, rather than completely independent occurrences."[11] *Wells*, ¶ 22.

¶47     In *Harris*, we upheld Harris's conviction for a single count of incest for sexually assaulting his adopted daughter at the family home over a period of multiple years. *Harris*, ¶¶ 11-15. Specifically, even though Harris's jury received no specific-act unanimity instruction, we refused to review this alleged error under plain error review. Despite the prosecution's failure to instruct the jury to agree on a specific instance of incest, we noted that the credible testimony of Harris's adopted daughter revealed an identical pattern of "incessant . . . sexual exploitation" by Harris, qualifying Harris's verdict for the "continuous course of conduct" exception. *Harris*, ¶¶ 12-15. Although Mathis's case involves fewer instances of abuse than *Harris*, T.N.'s testimony, supplemented by that of J.M. and Norling, established a continuous series of "incessant criminal acts" that were "so closely connected as to be . . . viewed as a single . . . running offense." *Harris*, ¶¶ 14-15. Like the abuse in *Harris*, Mathis's abuse occurred against a family member that lived in the same family home, occurred in the same location in the family home, and had a similar and repeated pattern of conduct. In Mathis's case, this similar pattern of conduct was Mathis's frequent requests for T.N. to touch her breasts in the family living room on Friday nights after Mathis had been drinking—specific facts which two other family members, J.M. and Norling, confirmed. Here, there was no indication that the jury did not believe

---

[11] The State may charge a case as a "continuous course of conduct," which expressly recognizes that a defendant's criminal act over a specific time period involved several different, but continuous and related, instances of criminal behavior.

that each of the three to four specific instances of abuse that T.N. testified to had occurred—especially because of how similar in time (Friday movie nights), place (the living room of the Mathis's family home), and manner (Mathis forcing her breasts upon T.N. after she had been drinking alcohol) each alleged instance of abuse was. The State's case against Mathis did not emphasize two specific instances of abuse, but rather, a continuous course of conduct.[12] Based on the totality of the evidence and upon our review of the law respecting specific-act unanimity instructions, we decline to employ the plain error doctrine to review Mathis's claim that the jury should have been instructed differently.

**CONCLUSION**

¶48 Mathis's conviction is affirmed. Mathis's constitutional challenge to § 46-15-320, MCA, fails, as Mathis cannot show it was the statute, rather than the witnesses' refusal to be interviewed, that prevented her from having pretrial access to interview them. Mathis's failure to receive T.N.'s April 2018 interview did not affect the outcome of her trial based on the strength of the existing evidentiary record. Last, the District Court's failure to offer a specific-act unanimity instruction to the jury does not merit reversal under plain error review.

¶49 Affirmed.

/S/ LAURIE McKINNON

---

[12] This confusion is further evidenced by the jury's note during deliberations asking "[w]hy are the charges separated into 2 counts?"

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JIM RICE

Justice James Jeremiah Shea, dissenting.

¶50    I dissent from the majority's Opinion for two reasons.  First, the majority Opinion is based entirely on the presumption that forensic interviews that neither the trial court nor this Court have ever seen would not have made any difference in a trial in which the jury heard testimony about a series of nearly identical incidents that were divided into two counts, and after considering all of this testimony, found Mathis not guilty of one of those counts.  Yet, the majority feels confident in assessing the exculpatory value of this evidence sight-unseen.  More fundamentally troubling is that in reaching this holding, the majority departs from established precedent in which this Court has consistently held we will not attempt to pass judgment on the exculpatory value of evidence we have not seen.  *State v. Johnston*, 2014 MT 329, ¶ 9, 377 Mont. 291, 339 P.3d 829; *State v. Little*, 260 Mont. 460, 466, 861 P.2d 154, 158 (1993).  Not only does the majority depart from this established precedent, it does so without even attempting to distinguish it.  On this basis alone, I would resolve this issue exactly as this Court resolved it when faced with the identical issue in *Little* and *Johnston*.  I would remand this case to the District Court to conduct an in camera review of all the forensic interviews that it had twice previously ordered the State to produce for in camera review but which were never produced.  Pending the District Court's

34

resolution of this matter on remand, I would decline to address the merits of Mathis's appeal.

¶51    In holding that Mathis was not prejudiced by the State's failure to produce the forensic interviews for in camera review, the majority relies exclusively on our holding in *Stutzman*. The majority finds *Stutzman* persuasive because "Mathis's contention is similar to Stutzman's claim regarding the value of the [records at issue in *Stutzman*]." Opinion, ¶ 37. The majority then concludes Mathis's contention "fails against the 'strength of the record . . . as a whole.'" Opinion, ¶ 37 (quoting *Stutzman*, ¶ 35). The critical comparison between this case and *Stutzman*, though, is not Mathis's contention regarding the value of the records—it is that in *Stutzman* we actually had the whole record and could assess for ourselves the value of the withheld evidence relative to the other evidence in the record.

¶52    In *Stutzman*, the District Court properly conducted an in camera review of the records at issue, concluded they contained no exculpatory evidence, and declined to disclose them to the defense. *Stutzman*, ¶ 8. On appeal, we held that although the district court abused its discretion by failing to produce some of the records to the defense, the error was not grounds for reversal because it would not have affected the outcome of the case. *Stutzman*, ¶ 35. But we were able to reach this conclusion in *Stutzman* only after we had "conducted *a complete review* of the . . . records that the District Court reviewed in camera." *Stutzman*, ¶ 30 (emphasis added). In fact, rather than supporting the proposition that an in camera review was unnecessary, as the majority Opinion implies, *Stutzman* reiterated that "[w]hen a defendant requests a crime victim's confidential records, the

35

district court has a '*duty* to conduct an in camera review to ascertain whether there [is] any exculpatory evidence in the files.'" *Stutzman*, ¶ 29 (emphasis added) (quoting *Johnston*, ¶ 9). It was only after conducting this complete review of the withheld records in *Stutzman* that we could assess whether they contained exculpatory evidence and, if so, whether their production may have impacted the outcome of the trial. Since neither the District Court nor this Court have ever seen the records at issue in this case, it is quite simply impossible to assess whether, and to what degree, they may be exculpatory; consequently, it is likewise impossible to assess whether, and to what degree, the records may have impacted the outcome of the trial.

¶53 As opposed to the inapposite situation in *Stutzman*, this case is factually and procedurally indistinguishable from our holdings in *Little* and *Johnston*. In *Little*, when the district court failed to conduct an in camera review of the victims' Department of Family Services (DFS) files, this Court issued an interlocutory appellate order requiring the District Court to conduct an in camera inspection of the records and enter appropriate findings regarding whether the files contained information relevant to the defendant's prosecution. "We concluded that an actual in camera inspection of the DFS files was *necessary* to complete the record on appeal." *Little*, 260 Mont. at 466, 861 P.2d at 158 (emphasis added).

¶54 In *Johnston*, the defendant moved to compel discovery of records related to an ongoing DPHHS case involving the children he was accused of sexually abusing. The District Court denied the motion without conducting an in camera review. Johnston was

36

convicted of all but one of the charges against him. *Johnston*, ¶ 2. On appeal, we held that Johnston invoked his right to potentially exculpatory information, and "[o]nce he invoked that right, it was the trial court's duty to conduct an in camera review to ascertain whether there was any exculpatory evidence in the files." *Johnston*, ¶ 9. We therefore ordered that Johnston's appeal be dismissed without prejudice and remanded the matter to the district court to conduct an in camera review of the records at issue, and to enter findings and an order regarding whether or not the files contain information that should have been disclosed to the defense. *Johnston*, ¶ 10.

¶55 Since the majority fails to address *Little* and *Johnston*, it likewise fails to offer any discernable reason for treating this case any differently than these established precedents. The majority goes to great lengths to explain why it does not need to actually see the evidence in this case to conclude it would not have made a difference in the outcome of the trial. But this Court did not seek to minimize or excuse the denial of due process in either *Little* or *Johnston*. Instead, in both *Little* and *Johnston* we recognized the court's duty to conduct an in camera review and we summarily remanded the matter to the district court so that it could fulfill that duty, after which the documents that were "necessary to complete the record on appeal" could be reviewed by this Court so that we could, in turn, fulfill our duty as an appellate court.

¶56 If an in camera review had been conducted in this matter—whether before trial as was ordered by the District Court or on remand as this Court ordered in *Little* and *Johnston*—we could then review the records on appeal and properly assess whether they

37

would have affected the outcome of Mathis's trial. Depending on that review, it is entirely possible I may have ultimately agreed with the majority that the records would not have impacted the outcome of Mathis's trial. But I am unaware of any precedent in which this Court has passed judgment on the value of potentially exculpatory evidence relative to the outcome of a trial without even looking at the evidence, and the majority cites to none. We have repeatedly imposed an unambiguous duty on the district courts to conduct in camera reviews of potentially exculpatory evidence, *Johnston*, ¶ 9, *Stutzman*, ¶ 29. That duty is no less incumbent on this Court. I can conceive of no reason why we should absolve ourselves of it in this case. Due process and common sense dictate that if you're going to call "no harm, no foul," you should at least see the foul.

¶57 Although I dissent principally on the basis of the majority's departure from established precedent, I also must take issue with how the majority holds Mathis accountable for the State's failure to lodge the forensic interviews for in camera review as ordered by the District Court. The majority acknowledges that "Mathis made two pretrial requests for all 'forensic interviews' related to Norling's case." Opinion, ¶ 32. The majority acknowledges that although the District Court ordered the evidence be lodged for in camera review, neither the prosecution nor DPHHS ever lodged any of the forensic interviews. Opinion, ¶ 32. Yet, having acknowledged that Mathis twice requested "all forensic interviews," the majority goes on to contrarily hold that Mathis "failed to pursue discovery of T.N.'s interview on *three* separate occasions." Opinion, ¶ 38. The majority faults Mathis for failing to raise an objection "when the State did not lodge the interview

in response to the court's March 2019 Order," and "when the forensic interview was not produced pursuant to the subpoenas to DPHHS." Opinion, ¶ 38. We should not casually disregard the marker being laid down in this case. The upshot of the majority's holding is that a defendant can twice seek discovery of potentially exculpatory evidence by court order and subpoena, but if the *State* fails to comply with both the order and the subpoena, this Court will hold the *defendant* accountable for not trying harder to compel the State's compliance.

¶58 In civil cases, where the stakes are not an individual's liberty, "[w]e have repeatedly articulated a low-tolerance approach toward discovery abuse, encouraging district courts not to give transgressors second chances but rather to impose sanctions." *Peterman v. Herbalife Int'l, Inc.*, 2010 MT 142, ¶ 17, 356 Mont. 542, 234 P.3d 898. This is not even to suggest that the State deliberately withheld the forensic interviews in this case or that sanctions are warranted. As the majority notes, "[t]he record in these proceedings has been difficult to review because of imprecise objections, imprecise pleadings and orders, overlapping evidence from two different cases, and the amount and type of pretrial discovery that was amassed." Opinion, ¶ 33. But in a case where the record suggests the production of materials was difficult to track by both parties and the District Court, it seems curious that only Mathis bears the burden of this confusion.

¶59 The majority characterizes the "issue at hand" as "whether Mathis is entitled to a new trial" because she never received T.N.'s forensic interview. Opinion, ¶ 33. With respect, I submit the majority is missing the point. Mathis may prefer the remedy of a new

trial, but that is not the remedy that due process requires in this situation, and it is not the remedy I would grant.[1]  The real issue at hand is not whether Mathis is entitled to a new trial; it is whether Mathis is entitled to the due process of an in camera review, which may not even result in a new trial.  A no less important issue is whether this Court will impose a new and increased burden on defendants seeking discovery of potentially exculpatory evidence that requires they not only request discovery of the evidence and obtain court orders compelling its discovery, but that they continually persist when the evidence is not forthcoming as ordered or run the risk that this Court will conclude they forfeited their right to it.  Fundamentally, the issue at hand is whether this Court will adhere to its established precedent—which, if it did, would bring with it the added benefit of resolving both of these issues.

¶60     In accordance with our precedent, I would remand this case to the District Court to conduct an in camera review of the forensic interviews.  Pending the District Court's in camera review, I would decline to address the merits of Mathis's appeal.  I therefore dissent.

/S/ JAMES JEREMIAH SHEA


Justice Ingrid Gustafson and Justice Dirk Sandefur join the Dissent of Justice James Jeremiah Shea.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

_____

[1] As the majority acknowledges, Mathis sought the alternative relief of remand for an in camera review.  Opinion, ¶ 33, n.8.

Justice Dirk Sandefur, dissenting in part, concurring in part.

¶61     I dissent on Issue Nos. 1 and 2. However, while I continue to assert that this was a classic case requiring a special unanimity instruction, I reluctantly concur that, under the particular circumstances of this case, Mathis ultimately failed to demonstrate plain error on appeal.

/S/ DIRK M. SANDEFUR