Chief Justice Mike McGrath delivered the Opinion of the Court.
***264 ¶1 Richard Douglas Reinert's appeal stems from a March 6, 2015 trial, where a jury found him guilty of deliberate homicide. He appeals the August 4, 2015 District Court order denying his motion for a new trial based on the State withholding exculpatory or impeachment evidence and the District Court's trial ruling allowing the State to elicit testimony of a prior bad act. We affirm.
¶2 We restate the issues on appeal as follows:
Issue One: Did the District Court err when it denied Reinert's motion for a new trial based on his assertion that the State withheld evidence regarding the forensic pathologist's expert testimony?
Issue Two: Did the District Court abuse its discretion when it allowed the State to elicit testimony of a prior bad act by Reinert to rebut the assertion that he was justified in his use of deadly force?
FACTUAL AND PROCEDURAL BACKGROUND
¶3 Richard Douglas Reinert (Reinert) killed Jessica Stephenson (Jessica) at 11:30 p.m. on December 21, 2013, inside his home. Reinert discharged nine bullets, with at least six bullets striking Jessica in the upper chest and head. Earlier that evening Jessica went to Reinert's home to meet up with her friend, Danielle, Reinert's wife. The three began drinking alcohol and then attended the Billings rodeo, where they continued to drink. After the rodeo, they continued to drink at a *664 local bar. Surveillance recordings of that night showed Reinert outside the bar, slipping on the ice, and at one point laying in the road requiring assistance. Jessica drove them all home around 11:00 p.m. Before they arrived home, Reinert jumped out of Jessica's vehicle, injuring himself, and then reluctantly returned to the vehicle. At the Reinert residence, Reinert and Danielle engaged in a violent verbal and physical domestic dispute. At some point Jessica went into the home to help.
¶4 Danielle and Reinert testified that Reinert had made himself a drink and used a bread knife to slice a lime. Reinert was walking ***265 around with the knife, he and Jessica fought over it, and eventually Danielle took the knife from Reinert, slicing her palm in the process. She was afraid of Reinert's conduct that evening, so she began hiding their home defense guns. Danielle testified that Reinert and Jessica got into a physical fight where they were both on the floor and kicking, punching, hair pulling, and screaming at each other. Danielle testified that Reinert retrieved a revolver. Danielle managed to take the revolver and went into the bathroom to hide it. Reinert then retreated to the master bedroom. While in the bathroom Danielle heard the gun shots.
¶5 Reinert testified that when he retreated to the master bedroom, he obtained a pistol from his bed. Jessica then came into or was already in the master bedroom, moving quickly towards him, with something in her hand. When surprised, Reinert shot nine bullets and killed Jessica. Immediately prior to her death, Jessica had been on the phone with 911 for approximately one and a half minutes, reporting the domestic dispute. The call to 911 recorded Jessica prior to the shooting, the shooting itself, and the aftermath.
¶6 The 911 recording reveals that, immediately after the shooting Danielle started screaming. Reinert shouted at her "you made me f**king shoot her," "you made me f**king do this because of you," "you made me do this," and "you are the one that made me kill her." The couple's domestic dispute continued. The police arrived shortly thereafter and found Reinert struggling with Danielle. He was on top of her in the hallway outside of the master bedroom. The revolver was found underneath Danielle. Jessica was pronounced dead at the scene.
¶7 Reinert and Danielle were transported to the Billing Police Department. In jail, when informed by police that he could not see his wife because they were investigating, Reinert asked "investigating what?" During the police interview that day Reinert admitted to shooting Jessica and causing her death, yet told police "I've done nothing wrong" because he was scared for his life and justified in his use of force.
¶8 At trial, the State presented testimony of Dr. Thomas Bennett, the forensic pathologist who conducted the autopsy on Jessica. Dr. Bennett testified regarding his findings, described where Jessica was standing when she was shot, and how many bullets struck her. The jury heard the 911 call placed by Jessica just a minute before her death. They listened to a crying woman report a domestic dispute, that her friend's husband was so drunk he was pointing a gun at his own head, and the sudden firing of nine shots. The jurors heard Danielle screaming and Reinert saying he killed Jessica because of Danielle. Physical evidence ***266 showed that Jessica was standing about three feet away from Reinert and was on the phone when he shot her. The lead detective testified that Reinert's assertion that he acted in self-defense was not supported by the evidence.
¶9 Reinert testified on his own behalf. Reinert testified he believed Jessica was coming at him with something in her hand. He shot her because of his fear of serious bodily injury or death. Pursuant to his justifiable use of force theory, Reinert testified he was a peaceful man and introduced evidence that he was trustworthy and truthful. He testified to a specific instance where another man wanted to fight him and instead of fighting, Reinert filed for a restraining order. Reinert testified that he was not someone who was quick to get into physical confrontations with others and that he had never been violent towards his wife. A previous instance of him punching through their bathroom door was an attempt to protect his wife who had fallen in the locked bathroom. Reinert reiterated *665 that he told the police he had "done nothing wrong," because when he shot his gun he believed he was in danger of serious bodily injury or death.
¶10 The State was allowed to introduce, on cross-examination, a 2011 police report that Reinert filed after a night of drinking. The State argued the police report was false and went directly to Reinert's assertion of his truthfulness and that he was trustworthy.
¶11 On March 6, 2015, after five days of trial and four hours of deliberation, the jury found Reinert guilty of deliberate homicide, and in the commission of that crime he used a deadly weapon. On April 2, 2015, Reinert filed a motion for a new trial asserting the State withheld favorable impeachment evidence regarding Dr. Bennett. The District Court denied the motion. Reinert appeals.
STANDARD OF REVIEW
¶12 Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice. Section 46-16-702(1), MCA. We review the district court's denial of a motion for a new trial for an abuse of discretion. State v. Jackson , 2009 MT 427, ¶ 50, 354 Mont. 63, 221 P.3d 1213. This Court's review of questions regarding constitutional law is plenary and the district court's factual findings are reviewed for clear error. Jackson , ¶ 50.
¶13 District courts are vested with broad discretion in controlling the admission of evidence at trial. Seltzer v. Morton , 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561. We review the district court to determine whether the court abused its discretion. Seltzer , ¶ 65.
***267 DISCUSSION
¶14 Issue One: Did the District Court err when it denied Reinert's motion for a new trial based on his assertion that the State withheld evidence regarding the forensic pathologist's expert testimony?
¶15 On appeal, Reinert argues the prosecution violated his constitutional right to due process guaranteed in the Sixth and Fourteenth Amendments to the United States Constitution because the prosecution withheld exculpatory evidence, evidence the defense could have used to impeach the state's expert witness, Dr. Bennett. Reinert contends that the District Court abused its discretion by not granting his motion for a new trial.
¶16 It is fundamental that the State must disclose any evidence that is material to a defendant's guilt or punishment. Brady v. Maryland , 373 U.S. 83, 88, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963) ; Jackson , ¶ 52. Further, the prosecutor shall make available to the defendant for examination "all material or information that tends to mitigate or negate the defendant's guilt as to the offense charged or that would tend to reduce the defendant's potential sentence." Section 46-15-322(1)(e), MCA. The prosecutor's failure to turn over evidence that is favorable to the defense and material to the defendant's guilt or punishment can violate a defendant's Fourteenth Amendment guarantee of due process, and therefore, require a new trial. Jackson , ¶ 52 ; Smith v. Cain , 565 U.S. 73, 75, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012). Within the meaning of Brady , material evidence is that evidence which, had it been disclosed, the result of the proceeding would have been different. Smith , 565 U.S. at 75, 132 S.Ct. at 630
¶17 To prove a due process violation under Brady , a defendant must show: (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different.[1] Jackson , ¶ 53. To *666 prove a reasonable probability that the result would have been different, a defendant need only show ***268 that "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." Smith , 565 U.S. at 75, 132 S.Ct. at 630.
¶18 The District Court determined that Reinert failed to prove that "had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different." Jackson , ¶ 53.
¶19 Reinert asserts that the State was in possession of a letter which was material to his guilt and punishment and vital to his defense. The letter was written by the State Medical Examiner, Dr. Gary Dale, who questioned Dr. Bennett's credentials, expertise, and conduct in previous autopsies. In his affidavit, attached to the Defense's motion for a new trial, Dr. Dale asserted Dr. Bennett testified falsely under oath and previously misdiagnosed trauma in infants.
¶20 Reinert argues Dr. Bennett's testimony was an integral part of the prosecution as it was used to bolster the State and lead detective's theory of the crime, validate the crime scene photos, and undermine Reinert's theory of the events. Therefore, if Reinert had been in possession of the letter, he could have impeached Dr. Bennett's findings, particularly his opinion as to how far away Jessica was from Reinert when he shot her, and Dr. Bennett's changed opinion regarding the number of bullets which struck Jessica, and thus the State's theory of the case. Reinert asserts this is sufficient to show a reasonable probability existed that with the letter the outcome of the proceeding would have been different.
¶21 Dr. Bennett testified that he initially believed seven bullets caused eight bullet paths, but later concluded that it could have been six. Admitting he did not change the autopsy report, Dr. Bennett testified, during cross-examination, that what he initially thought was two different bullet paths, he now believed were caused by the same bullet; the bullet first going through Jessica's wrist and then continued into her head or chest.
¶22 After a review of the transcripts, we agree with the District Court. We fail to see how the letter, if provided to the defense, would have changed the outcome of the proceeding. Dr. Bennett testified about the autopsy he performed on Jessica, described where she was standing when she was shot, and how many bullets struck her. Dr. Bennett's changed opinion regarding the number of bullets Jessica was shot with does not undermine the confidence of the trial. The defense had ample opportunity to cross-examine Dr. Bennett on that issue. Nor would the evidence of where Jessica was standing be undermined by use of the letter. No one, including Reinert, disputes the fact that he shot Jessica ***269 and that was the cause of her death. The totality of the evidence was overwhelming; Reinert shot and killed Jessica.
¶23 Reinert alleges a second Brady violation, the State's introduction of his recorded jailhouse calls at sentencing. On appeal, Reinert fails to assert any of the requirements necessary to prove a Brady violation, and thus fails to substantively argue the issue on appeal. A general claim that the State violated a defendant's right to due process by interfering with his attempt to prepare a defense cannot support a Brady violation claim. State v. Brown , 1999 MT 133, ¶ 20, 294 Mont. 509, 982 P.2d 468. We will not consider unsupported issues or arguments. In re Custody of Krause , 2001 MT 37, ¶ 32, 304 Mont. 202, 19 P.3d 811. It is not this Court's obligation to formulate arguments for a party in support of positions taken on appeal. State v. Davis , 2003 MT 341, ¶ 29, 318 Mont. 459, 81 P.3d 484.
¶24 Additionally, Reinert raises this Brady violation for the first time on appeal. Reinert admits this, but asks this Court to conduct a plain error review based on the manifest miscarriage of justice. This Court generally will not address issues raised for the first time on appeal. State v. Kaarma , 2017 MT 24, ¶ 28, 386 Mont. 243, 390 P.3d 609. This Court may choose to invoke the common law plain error doctrine, if by failing *667 to review the claimed error it "may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." State v. Favel , 2015 MT 336, ¶ 13, 381 Mont. 472, 362 P.3d 1126. We decline to conduct a plain error review in this case.
¶25 Issue Two: Did the District Court abuse its discretion when it allowed the State to elicit testimony of a prior bad act by Reinert to rebut the assertion that he was justified in his use of deadly force?
¶26 Reinert argues that the District Court abused its discretion when it allowed cross-examination regarding a previous police report he filed. Evidence of a person's character is not admissible for the purpose of proving he acted in conformity therewith on a particular occasion. Kaarma , ¶ 74; M. R. Evid. 404(a). However, if probative of truthfulness and for the purpose of attacking or supporting the witness's credibility, specific instances of the conduct of a witness may be inquired into on cross-examination of the witness concerning the witness's character for truthfulness. M. R. Evid. 608(b)(1). Even if evidence is relevant, the court may exclude it if its "probative value is substantially outweighed by the danger of unfair prejudice." M. R. Evid. 403 ; State v. Franks , 2014 MT 273, ¶ 15, 376 Mont. 431, 335 P.3d 725 ;
***270 State v. Blaz , 2017 MT 164, ¶ 20, 388 Mont. 105, 398 P.3d 247.
¶27 Reinert admitted to shooting Jessica, which was the direct cause of her death, but that he was justified in his actions. Prior to trial, Reinert filed notice with the District Court of his intent to present evidence of his character for peacefulness. To prove this assertion, the defense introduced evidence of Reinert's good character, specifically, a restraining order he took out and testimony that Reinert was trustworthy, peaceful, and almost never angry. Reinert testified that he fired his gun at Jessica because he believed he was in danger of death or serious bodily injury and that he had no other option at that time. Reinert testified that he told the police he had "done nothing wrong," because when he shot his gun he believed he was in danger of death or serious bodily injury.
¶28 After Reinert's testimony the State requested an in chambers conference to discuss the introduction of a specific instance of his conduct. The State argued Reinert opened the door to evidence of his character and truthfulness, and sought to elicit testimonial evidence to rebut his assertion. During the in-chambers conference, defense counsel agreed that by having Reinert testify "we do open him up to the consequences ... and a full and complete cross examination as to the probative elements of his testimony," yet argued the evidence was irrelevant and prejudicial.
¶29 After a lengthy discussion in chambers, the District Court ruled it would allow the State to cross-examine Reinert on the police report. The District Court noted its consideration of M. R. Evid. 405 and 608(b), as well as State v. Carter , 285 Mont. 449, 948 P.2d 1173 (1997) and State v. Clark , 209 Mont. 473, 682 P.2d 1339 (1984). It also cautioned the State that "this is not a trial within a trial." The State agreed to a narrow questioning regarding the false police report.
¶30 On cross examination, the following exchange took place:
BY MR. ZINK:
Q. Mr. Reinert, finally, have you ever lied to law enforcement before?
A. Have I ever lied to them before?
Q. Yes.
A. Yes, many times, I'm sure.
The defense then renewed its objection to this line of questioning under M. R. Evid. 402 and 403.
THE COURT: Mr. Zink? (State Attorney)
MR. ZINK: I think the Court has already ruled.
THE COURT: Go ahead. I guess to clarify, I made it under 405(b) and 608, I think.
***271 MR. BARTLESON: Understood, ma'am.
BY MR. ZINK:
Q. Mr. Reinert, in August of 2011, were you living in Hillsborough County, Florida?
A. I was.
*668 Q. During that time frame, did you have an evening of drinking with some of your friends?
A. Friends of friends.
Q. And after that, did you report a serious offense committed against your fiancée, Danielle, by one of your friends or friend's friend?
A. Friend's friend, yes.
Q. Danielle denied that offense ever happened, didn't she?
A. Indeed.
Q. Law enforcement investigated, didn't they?
A. No, they did not.
Q. Didn't they conclude after getting a statement from you under oath and from Danielle under oath that the events were unfounded?
A. Yes, sir.
Q. Didn't you tell them that in the end maybe it didn't happen the way you thought it did, you were just paranoid?
A. Indeed.
MR. ZINK: Your Honor, thank you. I have no further questions.
¶31 Montana Rule of Evidence 405 provides:
(a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
(b) Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, or where the character of the victim relates to the reasonableness of force used by the accused in self defense, proof may also be made of specific instances of that person's conduct.
¶32 Montana Rule of Evidence 608(b) provides:
(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross- ***272 examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
¶33 When the accused presents evidence not of a pertinent character trait, but of his good character in general, he opens the door to all legitimate cross-examination and must, therefore, accept the consequences which result. State v. Carter , 285 Mont. at 458, 948 P.2d at 1178 (1997) (citing State v. Heine , 169 Mont. 25, 28, 544 P.2d 1212, 1214 (1975) ). It is axiomatic that when a defendant first offers evidence of good character the State may then present rebuttal evidence of bad character. Kaarma , ¶ 76. Reinert presented evidence that he was peaceful and trustworthy. The State was allowed to present other character evidence to rebut it. Kaarma , ¶ 76. The District Court did not abuse its discretion.
¶34 Moreover, the defense's assertion that the District Court failed to conduct a 403-balancing test is without merit. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. M. R. Evid. 404(b). The defense specifically and repeatedly encouraged the District Court to find this specific instance of conduct was more prejudicial than probative, which the District Court declined to do. The Court conducted a long session in chambers on this question. The District Court's determination that evidence of this specific instance of conduct was admissible, under M. R. Evid. 608 and 405, to rebut Reinert's assertions was well thought out and not an abuse of discretion.
CONCLUSION
¶35 Reinert has failed to prove a Brady violation by the State. The District Court did not err when it denied Reinert's motion for a new trial. The District Court was within its *669 discretion when it allowed cross examination regarding Reinert's prior bad act.
¶36 Affirmed.
We Concur:
JAMES JEREMIAH SHEA, J.
JIM RICE, J.
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.

On several occasions prior to 2014, this Court declined to find a Brady violation where the defense could have obtained the exculpatory evidence through the exercise of reasonable diligence. In 2014, the Ninth Circuit Court of Appeals determined that a requirement of due diligence is contrary to federal law and unsound public policy in Amado v. Gonzalez , 758 F.3d 1119, 1136 (9th Cir. 2014). This Court acknowledged that holding in State v. Weisbarth , 2016 MT 214, ¶ 30, 384 Mont. 424, 378 P.3d 1195. Going forward we will decide issues regarding the withholding of exculpatory evidence without reference to a reasonable diligence requirement.