FILED

04/09/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0290

DA 21-0290

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 76

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

KYLE LEE SEVERSON,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Richland, Cause No. DC-19-55
Honorable Olivia Rieger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

        Chad Wright, Appellate Defender, Michael Marchesini, Assistant Appellate Defender, Helena, Montana

      For Appellee:

        Austin Knudsen, Montana Attorney General, Christine Hutchison, Assistant Attorney General, Helena, Montana

        Charity McLarty, Richland County Attorney, Sidney, Montana

Submitted on Briefs: February 14, 2024

Decided: April 9, 2024

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Kyle Severson appeals a jury conviction for mitigated deliberate homicide after he shot Tyler Hayden on the evening of July 2, 2019. We address the following issues on appeal:

> *1. Did the District Court err when it denied Severson's motion to dismiss based on the State's failure to disclose favorable evidence?*

> *2. Did the cumulative effect of errors in the District Court deny Severson a fair trial?*

¶2 We conclude that the cumulative effect of errors in the proceedings denied Severson his constitutional rights to a fair trial and due process. We reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On July 2, 2019, Severson, his girlfriend Karina Orozco, her sister Jessica Orozco, and Severson's and Karina's three-year-old daughter drove to the Loaf 'N Jug convenience store in Sidney. Severson was sitting in the rear passenger seat of the vehicle. Karina and Jessica entered the store; Severson and his daughter stayed in the car. Six minutes later, Hayden and Dalton Watson arrived at the store and parked next to Karina's vehicle. Both Watson and Hayden entered the store. After a few minutes, Watson returned to his vehicle. Karina and Jessica exited the store roughly forty-five seconds later. Twenty seconds after that, Hayden exited and returned to the passenger side of Watson's vehicle. After briefly confirming with Watson that Severson was in the back seat of Karina's car, Hayden turned and approached Severson's open window. Karina, who was driving the vehicle, stopped

2

the car as Hayden approached. Karina testified at trial that as he approached, Hayden said something "[l]ike aggressive, taunting." Watson testified that "[Hayden] said 'hey buddy, it's been a long time. How you been doin' in a friendly way." As Hayden approached, Severson raised a .38 caliber handgun, shot Hayden at close range, and killed him.

¶4 Immediately after the shooting, Watson exited his vehicle to assist Hayden, who had fallen to the ground. Security camera footage of the shooting shows Watson running to assist Hayden, tripping on the curb, retrieving an object from the ground near Hayden, running back to his vehicle, and then returning to help Hayden. It was later determined that the object Watson picked up was a .22-caliber handgun. Watson claimed that he, not Hayden, had been the one carrying the handgun and that it had flown out of his pants when he tripped on the curb. As Watson assisted Hayden, Karina quickly drove away. Severson immediately told Karina to drive him to the police station. Once there, Severson waived his *Miranda* rights, admitted to the shooting, and claimed that he was scared that Hayden was going to harm him or his daughter. Severson also recounted to law enforcement a history of confrontations between himself and Hayden. Roughly a year before the shooting, in April 2018, Hayden and another man followed Severson and Severson's brother-in-law into the parking lot of an IGA. Hayden exited his vehicle and immediately began assaulting Severson's brother-in-law, attempting to drag him from the passenger side of the vehicle Severson was driving. Additionally, although he did not tell law enforcement during his initial interview on the night of the shooting, Severson later recounted a March 2018 incident in which Hayden robbed Severson at gunpoint.

3

¶5     Severson was charged by information with deliberate homicide in violation of § 45-5-102, MCA.[1]   On October 2, 2020, a jury found Severson guilty of mitigated deliberate homicide.  The District Court sentenced him to forty years in prison.  We discuss additional pertinent facts below.

## STANDARDS OF REVIEW

¶6     We review the grant or denial of a motion to dismiss de novo to determine whether the district court's conclusions of law are correct.  *State v. Seiffert*, 2010 MT 169, ¶ 10, 357 Mont. 188, 237 P.3d 669.   We exercise plenary review of constitutional questions, including alleged violations of a criminal defendant's due process rights.  *State v. Jackson*, 2009 MT 427, ¶ 50, 354 Mont. 63, 221 P.3d 1213 (citing *State v. West*, 2008 MT 338, ¶ 13, 346 Mont. 244, 194 P.3d 683).

## DISCUSSION

¶7     *1. Did the District Court err when it denied Severson's motion to dismiss based on the State's failure to disclose favorable evidence?*

¶8     Severson claims that the State violated his right to due process by failing to disclose favorable evidence as required under *Brady v. Maryland*, 373 U.S 83, 87, 83 S. Ct. 1194, 1196-97 (1963), and Montana law.  At issue are law enforcement investigative reports of a burglary of Severson's home and the contents of Watson's cell phone.

¶9     On the night of the shooting, after taking Severson to the police station and providing a statement, Karina returned to the home she and Severson shared and discovered

---

[1] Severson later was charged with evidence or witness tampering.  Severson pleaded guilty to the tampering charge and was sentenced to eight years in the Montana State Prison.  The tampering charge is not addressed in this appeal.

it had been burglarized that evening.  In the ensuing investigation, police identified Keaston

Johns, Logan Krauser, and Immanuel Brown as the primary suspects.  Johns was Hayden's

girlfriend at the time of the shooting.  Karina testified that she believed the assailants stole

several electronics, a guitar, a shotgun, and roughly $2,000 cash from the home.  On

August 6, 2019, in an unrelated search of Watson's apartment, police discovered Karina's

medical marijuana card in a safe in Watson's room.  In an interview with officers following

the search of his residence, Watson stated that following the shooting, while in a parking

lot adjacent to the Loaf 'N Jug, he received $300 from the two men suspected in the

burglary of Severson's home.[2]

¶10     On October 30, 2019, Severson sought to compel the disclosure of any "information

and reports" of law enforcement regarding the burglary.  The State objected, arguing the

reports were irrelevant to Severson's defense.  Finding he had failed to demonstrate a need

for the report evidence, the District Court denied Severson's motion on January 7, 2020.

On September 4, 2020, roughly three weeks before his trial, Severson again moved to

compel disclosure of the evidence.[3]  The District Court, reasoning that Severson could

---

[2] Watson initially told law enforcement that he had received $300 from Krauser and Immanuel Brown.  During a trial preparation interview with prosecutors, Watson recounted that he had received $700 from the burglary.  Then, during trial, Watson again changed his story, claiming that it had been only $300 but that Johns had been the person who gave him the money.  It is unclear from the record whether Watson knew the provenance of the money when he received it.

[3] At this point, Severson was unaware that the parties suspected to be involved in the burglary were associated with Watson and Hayden.  When arguing for disclosure of the reports, Severson's attorney said he had only "rumors" about the identities of the burglary suspects.  The State, however, knew the identities of the parties by at least August 2019.

receive the investigative information as the victim of the burglary, ordered that the reports be disclosed.

¶11    Upon reviewing the reports and learning of the potential connections between the burglary, Watson, and Hayden, Severson moved the District Court to compel disclosure of the contents of Watson's cell phone, which had been in the State's possession since the night of the shooting.  The Defense asserted that Watson and Hayden may have intercepted Severson at the Loaf 'N Jug as part of a conspiracy to burglarize Severson's home.  On September 28, 2020, the first day of Severson's trial, the State notified the court that it had never attempted to unlock the phone or to view its contents because, in the words of the prosecutor, the State "[didn't] have any indication that [it was] relevant."  The court ordered Watson to appear the following day to unlock the phone for the court to examine.  That evening, upon being notified by the prosecutor that the court would order him to unlock his phone, Watson asked "if he had to."  During the hearing the next morning, Watson testified that he could no longer recall the phone's passcode.[4]  Recognizing the significant time and effort needed for investigators to pursue entry of the phone, the court asked Severson if he wished to continue the trial until the phone could be unlocked.  Concerned that Severson already had been in custody for fifteen months, Severson's attorney rejected the court's offer of a continuance.

---

[4] The District Court also requested that Watson attempt to open the phone through fingerprint recognition.  Because the phone had been powered off, it could not be opened by fingerprint recognition.

6

¶12 Unable to access the potentially exculpatory cell phone information, Severson made two motions based on alleged violations of his rights to due process and a fair trial. First, following Watson's inability to access the phone, Severson moved orally to exclude Watson from testifying. Severson then moved to dismiss the case. The District Court denied both motions because, due to the State's failure to access the information on the phone and Watson's inability to unlock it, Severson had not shown that any evidence on the phone was favorable to him. *See State v. Williams*, 2018 MT 194, ¶ 21, 392 Mont. 285, 423 P.3d 596.

¶13 Trial proceeded as scheduled. Severson was found guilty and sentenced to forty years in the Montana State Prison.

¶14 Five months after trial, law enforcement was able to access the contents of Watson's phone. On June 29, 2021, the District Court ordered that the contents of the phone be filed under seal and made available to the parties. A review of the phone revealed that, although the phone belonged to Watson, Hayden had used it in the days leading up to the shooting. Included in the data retrieved from the phone were Facebook messages between Hayden and a person named Shammar Brown, indicating that on the day before the shooting Hayden had pulled a gun on Brown during an argument.

¶15 Suppression by the government of favorable evidence that is material to either the guilt or punishment of an accused violates due process irrespective of the innocent or malign intentions of the prosecution. *Brady,* 373 U.S at 87, 83 S. Ct. at 1196-97. The rule recognized by *Brady* and its progeny advances society's interest in conducting "criminal

trials [that] are fair," 373 U.S. at 87, 83 S. Ct. at 1197, ensures the accused is not deprived of life, liberty, or property without due process of law, U.S. Const. amend. XIV, § 1, and protects against miscarriages of justice, *United States v. Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 3380 (1985). The Montana Legislature has imposed a separate duty on all prosecutors to "make available to the defendant for examination and reproduction . . . all material or information that tends to mitigate or negate the defendant's guilt as to the offense charged or that would tend to reduce the defendant's potential sentence." Section 46-15-322(1)(e), MCA. This statutory duty persists, requiring disclosure of any new information that would have been subject to § 46-15-322, MCA, had it been known at the time of initial disclosure. Section 46-15-327, MCA.

¶16 To succeed on a *Brady* claim, a party must show that (1) the State possessed evidence favorable to the defense, (2) the State suppressed the evidence, and (3) had the State disclosed the evidence, there is a reasonable probability that the result would have been different. *State v. Reinert*, 2018 MT 111, ¶ 17, 391 Mont. 263, 419 P.3d 662.[5]

¶17 The State first argues that Severson waived any potential *Brady* claim by failing to request a continuance to investigate the contents of the phone when the State disclosed the

---

[5] Prior to 2014, this Court required a fourth *Brady* element requiring a claimant to show that "the petitioner did not possess the evidence nor could he have obtained it with reasonable diligence." *McGarvey v. State*, 2014 MT 189, ¶ 16, 375 Mont. 495, 329 P.3d 576 (quoting *Gollehon v. State*, 1999 MT 210, ¶ 15, 296 Mont. 6, 986 P.2d 395); *see also Seiffert*, ¶¶ 14, 15. In 2014, the Ninth Circuit Court of Appeals determined that a due diligence requirement improperly shifts the obligations imposed under *Brady* from the prosecution to the defense, is "contrary to federal law as clearly established by the Supreme Court," and is "unsound" as a public policy matter. *Amado v. Gonzales*, 758 F.3d 1119, 1136 (9th Cir. 2014). In 2018, this Court adopted the Ninth Circuit's rationale. *Reinert*, ¶ 17 n.1.

8

reports of the burglary. The State points to no authority binding on this Court for the proposition that a failure to request a continuance waives a *Brady* claim.[6] We decline to adopt such a rule here. Accordingly, we will address the merits of Severson's claim.

### a. Favorability of the evidence

¶18 Evidence is favorable, and therefore subject to the duties imposed by *Brady* and § 46-15-322, MCA, if it has the potential to lead directly to the discovery of admissible evidence. *State v. Stutzman*, 2017 MT 169, ¶ 28, 388 Mont. 133, 398 P.3d 265 (quoting *State v. Weisbarth*, 2016 MT 214, ¶ 24, 384 Mont. 424, 378 P.3d 1195). *Brady* evidence need not itself be admissible to trigger due process protections; it need have only the "potential to lead directly to admissible exculpatory evidence." *State v. Mathis*, 2022 MT 156, ¶ 34, 409 Mont. 348, 515 P.3d 758 (internal quotations omitted). Evidence tending to undermine or impeach a key state witness is of particular favorability to the defense for purposes of a *Brady* analysis. *Weisbarth*, ¶ 26 (citing *United States v. Price*, 566 F.3d 900, 914 (9th Cir. 2009)).

---

[6] The State draws the Court's attention to four cases it contends support its argument. *Madsen v. Doremire*, 137 F.3d 602 (8th Cir. 1998), and *United States v. Higgins*, 75 F.3d 332 (7th Cir. 1996), the State argues, stand for the proposition that the "failure to request a continuance when evidence is disclosed before or during trial constitutes a waiver of any *Brady* violation." The State fails to recognize, however, that both cases qualify this statement by requiring the evidence still be disclosed in time for the defendant to make beneficial use of it. *Madsen,* 137 F.3d at 605 ("there is no due process violation under *Brady* as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence") (internal quotation omitted); *Higgins*, 75 F.3d at 335 ("[d]isclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material") (citation omitted). The State does not explain how its production of the burglary reports two weeks before trial allowed Severson sufficient time to utilize the evidence on Watson's cell phone—which took five months to access. The only other authority offered by the State is from intermediate appellate state courts.

¶19 The favorability of the investigative reports should have been obvious to the State as early as August 7, 2019. On that date, Watson admitted to receiving items stolen from Karina. The information contained in the reports connected the burglary directly to Watson and Hayden. Watson received proceeds from the burglary—from Hayden's girlfriend—on the night of the shooting. The information connecting the burglary to the shooting had the potential to lead directly to the discovery of other exculpatory evidence, namely the contents of Watson's cell phone. *Mathis*, ¶ 34.

¶20 The evidence ultimately found on Watson's cell phone also is favorable under *Brady*. Severson's defense rested primarily on his claim that he was afraid for his and his family's safety when he shot Hayden. Key to that claim was Severson's state of mind when he shot Hayden and whether the jury found his testimony credible. At a minimum, had the Defense been aware of an altercation between Hayden and Brown just a day earlier, Severson would have had the opportunity to interview Brown about the incident, about the type of gun Hayden brandished, and about Hayden's reputation for violence.

¶21 The State's case rested in large part on the testimony of Watson. Evidence tending to suggest that Hayden had been in possession of a firearm the day before the shooting calls into question Watson's story that he was the one with the firearm found at the scene— a story Watson first recounted in September 2019, months after the shooting. As Severson points out, the very existence of Hayden's Facebook conversations on Watson's cell phone may suggest that Watson was aware of instances of Hayden brandishing a firearm and would have allowed Severson more effectively to cross-examine Watson about his

knowledge of Hayden's propensity to carry a firearm. Information that calls into question the credibility of a witness lies squarely at the heart of a prosecutor's duty to disclose evidence favorable to the defense. *See Weisbarth*, ¶¶ 22-25.

¶22 The State argues that Severson's claim cannot succeed on this evidence because it is a specific instance of a victim's prior bad acts, which is admissible only if the defendant was aware of the specific bad acts when he killed the victim. *See* M. R. Evid. 405(b); *State v. Montgomery*, 2005 MT 120, ¶¶ 18-19, 327 Mont. 138, 112 P.3d 1014. The State's argument, however, misapprehends two important factors. First, the cell phone evidence may have been admissible for purposes other than demonstrating Hayden's propensity for violence, such as undercutting Watson's credibility. Second, even evidence that is inadmissible can support a *Brady* claim. *Mathis*, ¶ 34. The message records found on Watson's cell phone could have supported the credibility of Severson's own fears of Hayden and called into question Watson's testimony that he was the person carrying a firearm on the evening of the shooting and that Hayden was "friendly" when he approached Karina's vehicle.

¶23 The favorability of the cell phone evidence is not confined to its impact on witness credibility. As Severson points out, none of the individuals connected to or suspected of playing a part in the burglary of Severson's home were ever charged for the crime. Although Watson was charged with criminal possession of dangerous drugs in the months after the shooting, he was offered a deferred prosecution by the State. The District Court noted the optics of the State's treatment of its own witnesses when it told the State,

11

"especially for crimes that occurred after the homicide, when you knew that [Watson] was going to be a witness . . . it was a bad idea to do a deferred prosecution." Had Severson known the contents of the phone at trial, he could have more effectively questioned the State's decision to not access it and better called into question the "thoroughness and even the good faith" of the State's handling of the investigation. *See Kyles v. Whitley*, 514 U.S. 419, 445, 115 S. Ct. 1555, 1571 (1995).

¶24 When he made his motions to dismiss and to exclude Watson, Severson could not and did not show that the cell phone contained any information favorable to the defense. That is no longer the case. Severson has shown that information on the phone "has the potential to lead directly to admissible exculpatory evidence." *State v. Ilk*, 2018 MT 186, ¶ 31, 392 Mont. 201, 422 P.3d 1219 (quotations omitted). The favorable nature of the evidence is apparent. *See State v. Fisher*, 2021 MT 255, ¶ 30, 405 Mont. 498, 496 P.3d 561 (citations omitted).

### b. Suppression of the evidence

¶25 It is not enough that a criminal defendant show that the state possessed favorable evidence, he must also show the government suppressed the evidence. *Rienert*, ¶ 17. Although the state is under no affirmative obligation to "take initiative or even assist the defendant with procuring exculpatory evidence," *State v. Wagner*, 2013 MT 47, ¶ 26, 369 Mont. 139, 296 P.3d 1142, neither may the state impede the defense's gathering of relevant evidence through the employment of rules and regulations. *See State v. Swanson*, 222 Mont. 357, 361-62, 722 P.2d 1155, 1158 (1986).

¶26 The State argues that Severson's rights were not violated because he possessed the Facebook records well before trial. The State points to the following exchange that took place shortly after Watson was unable to access the phone to argue the Defense had the cell phone evidence:

> THE STATE: Okay. Your Honor, we did get the Facebook and, I think, Snapchat records. Just Facebook. The Facebook Messenger records, which we got those regarding Dalton, okay.
>
> [DEFENSE COUNSEL]: Regarding who?
>
> THE STATE: The Messenger records regarding Dalton, Dalton's Messenger records.
>
> [DEFENSE COUNSEL]: We don't have those.
>
> THE STATE: We don't have those?
>
> [DEFENSE COUNSEL]: No, we don't have anything from Dalton Watson.
>
> THE STATE: Never mind, okay. I'm confusing Tyler and okay.

The State also points to its proposed exhibit list in which it listed "DISC 36: DVD containing Facebook records (Tyler Hayden)." This proposed exhibit and the above-mentioned exchange, the State asserts, show that Severson was in possession of Hayden's Facebook messages long before trial. In response, Severson argues that the in-court exchange and the exhibit list are insufficient to show what messages actually were disclosed.

¶27 After reviewing the record in this case, it is unclear what, if any, Facebook messages were included in "Disc 36" or what the prosecutor was referencing in the above-quoted exchange. No record evidence substantiates the claim that Severson was in possession of

13

the messages between Hayden and Brown or that those messages were a part of "Disc 36." Although the State has failed to show that it in fact disclosed the evidence at issue in this case, neither does Severson present evidence that he did not possess the Facebook messages. In support of his appeal, Severson points merely to the fact that the State has not proven it disclosed the information.

¶28     The record demonstrates that the State consistently resisted Severson's efforts to access the requested information. Both times Severson sought to compel the burglary reports, the State objected, claiming that no information in the reports was relevant to the shooting. As noted above, the State was in possession of information sufficient to establish a connection between the parties to the burglary and the shooting as early as August 2019. But even if the connection initially had gone unnoticed by the prosecution, in January 2020 police sent a request for prosecution of Johns and Krauser, putting the prosecution on notice of the relevance of the reports. Despite this knowledge, the State took no action to disclose the reports or investigate the contents of the phone in the months leading up to trial. When Severson moved to compel discovery of the reports for a second time in September 2020, the State again claimed they contained no relevant information. Following trial, the State argued that it had no probable cause to search the phone and that allowing Severson to access the contents of the phone would constitute a "treacherous" invasion of Watson's privacy. Granted, Severson was never denied access to the phone. But it also is clear that, whether by design or by oversight, the State's failure to investigate the phone, dubious claims of irrelevance, and employment of procedural excuses amounted to suppression of

favorable evidence in violation of the State's duties under *Brady*. *See Ilk*, ¶ 34 ("Prosecutors have a duty to learn of any favorable evidence known to the others acting on the government's behalf . . ." and this duty is "ongoing") (quotations and citations omitted); *Fisher*, ¶ 30 ("the State cannot frustrate the defense's evidence-gathering efforts through either affirmative acts or their rules and regulations") (quotations omitted).

### c. Probability of a different result

¶29 The third prong of a *Brady* claim requires a claimant to show that the suppression of favorable evidence "undermines confidence in the outcome of the trial." *Ilk*, ¶ 37 (quoting *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566). In considering whether a trial sufficiently protected the rights of the accused, we review the excluded evidence collectively, not in a piecemeal fashion. *Weisbarth*, ¶ 26 (citing *McGarvey*, ¶ 17).

¶30 Severson argues that the case ultimately boils down to a credibility battle between his version of events and Watson's. Any evidence tending to undermine Watson's credibility or supporting Severson's fear of Hayden, he maintains, had a reasonable probability of changing the result. As evidenced by their willingness to find Severson guilty only of the lesser included offense of mitigated deliberate homicide, Severson argues that the suppressed evidence easily could have tipped the jury in his favor. The State responds that Severson has failed to demonstrate the reasonable probability of a different outcome because none of the evidence on the phone was admissible to show Hayden had a propensity to violence and because evidence admitted at trial was sufficient to show that Severson's belief that he needed to shoot Hayden was not reasonable.

15

¶31     In *Ilk*, we had the opportunity to address the prejudice prong of *Brady*. *Ilk*, ¶¶ 37-39. Ilk was accused of attempted deliberate homicide for his altercation with two other individuals at a construction site, during which Ilk fired a handgun several times at the two individuals. *Ilk*, ¶ 4. During the ensuing investigation, a police detective took three sets of photographs of the crime scene. The first set, which was disclosed during discovery, was taken on the evening of the shooting when it already was dark out. *Ilk*, ¶ 8. The third set, also disclosed, was taken during the daytime, several weeks after the shooting when construction at the site had significantly changed the area. *Ilk*, ¶ 8. Then, during trial, the detective testified that he may have taken a second set of photographs during the daytime "within a day or two after the shooting." *Ilk*, ¶ 9. Ilk moved for dismissal based on the State's failure to produce the second set of photos during discovery. *Ilk*, ¶ 9. We determined that Ilk had not shown a reasonable probability of a different result because the additional photos would not have served to "put the whole case in a different light." *Ilk*, ¶ 39 (quoting *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566). Because other photographs of the scene were available, the defense had the opportunity to vigorously attack the State's case even in the absence of the additional evidence, and the record otherwise provided strong support for the jury verdict, we concluded that Ilk had not met his burden under *Brady*. *Ilk*, ¶ 39 (internal quotations omitted).

¶32     Severson's case is stronger. Here, the material he sought was not duplicative of evidence that was available during trial. Although Severson was able to present evidence of Hayden's past violent interactions with him, the conversation between Hayden and

Brown is singular in showing Hayden's similar behavior toward someone else just the day before the shooting—though it is not clear that Brown would have been available to testify or that his testimony would have been favorable to the Defense. Knowing that Hayden's girlfriend was involved in a burglary taking place at Karina's home at about the same time Hayden encountered her and Severson at the Loaf 'N Jug likely would have weighed heavily in the jury's mind. Additional evidence of Watson's connection to the burglary could have cast his credibility and willingness to participate with the State in a different light.

¶33 The District Court denied Severson's *Brady* motion because Severson could not show that the evidence on the cell phone was favorable to him. At the time the District Court made that ruling based on the record before it, it was correct. Accordingly, we cannot conclude that the District Court erred as a matter of law. Severson recognizes this flaw in his appeal and asks this Court to find that the State acted in bad faith. Severson argues that under our holdings in *Villanueva* and *Fisher*, the State's deceptive actions and animosity towards him are the reason he was unable to show that the evidence on Watson's cell phone was favorable to him. Accordingly, Severson argues, we should hold that the District Court erred as a matter of law when it found that Severson did not satisfy the *Brady* test in full. The District Court, however, did not find that the State had acted in bad faith, and the record does not compel a contrary conclusion.

¶34 The State's failure to disclose evidence is troubling and was wrong; it should have produced the favorable evidence. For the reasons discussed below, however, our decision

does not turn on Severson's *Brady* claim alone. When taken in the context of the entire trial, the *Brady* concerns contribute to our conclusion that Severson is entitled to a new trial. We need not determine whether, standing alone, the State's failure to disclose the information "undermines confidence in the outcome of the trial." *Ilk*, ¶ 37 (citing *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566).

¶35   *2. Did the cumulative effect of errors in the District Court deny Severson a fair trial?*

¶36   Severson alleges several other trial errors that he argues, taken together, deprived him of a fair trial. We address each in turn.

   *a. Prosecutorial misconduct*

¶37   Severson claims that the prosecutor violated his right to a fair trial by repeatedly referencing Severson's drug use in violation of the District Court's pretrial order in limine and by impermissibly blaming Severson for failing to discover the contents of Watson's cell phone.

¶38   Prior to trial, the Defense moved the court to preclude any evidence of a 2018 informant drug buy in which Severson allegedly sold marijuana to a police source. Following briefing and argument, the District Court ordered that "the State is prohibited from introducing evidence of the Defendant's alleged drug dealing or drug activity in its case in chief." The court's order left open the possibility, however, that such questions would be allowed during cross-examination if the Defense opened the door to them. During cross-examination of Karina, the prosecutor raised the issue of the burglary. She asked Karina, "Isn't it true that people also know that you would have had cash, guns, and

18

drugs in your house?" Severson's attorney immediately objected, and the court sustained. The prosecutor further initiated the following exchange with Karina:

Q. Okay. And I believe you testified that about $2000 in cash was also taken from your residence, correct?

A. Yes.

Q. Where did that money come from?

Severson's attorney again objected, the court again sustained. After the District Court already had sustained objections to her questions, the prosecutor asked Karina, "[i]sn't it true that Kyle posted pictures on social media, various forms, of cash and drugs?" Defense counsel immediately called for a sidebar conference outside the presence of the jury.

¶39 During direct examination of Mark Kraft, an officer involved in the investigation of the shooting, the prosecutor initiated the following exchange:

Q. Okay. In this case, did defense counsel ever [] request to inspect the physical evidence that you had in your property?

A. Yes.

. . .

Q. Okay. Have, has there ever been a request from the defense to access that phone and download it?

Defense counsel objected and requested a sidebar conference to discuss the issue with the court. During that conversation the District Court stated, "I do think that now you're shifting the burden to the Defendant and I'm not going to allow you to do that anymore."

¶40 Severson argues that the prosecutor's violation of the court's order in limine and her impermissible burden-shifting amount to prosecutorial misconduct, warranting reversal. In

19

response, the State argues that Severson has failed to show that Severson's substantial rights were prejudiced by the questioning. *See State v. Lehrkamp*, 2017 MT 203, ¶ 15, 388 Mont. 295, 400 P.3d 697 (citing *State v. Otto*, 2014 MT 20, ¶ 15, 373 Mont. 385, 317 P.3d 810; *State v. Dobrowski*, 2016 MT 261, ¶ 28, 385 Mont. 179, 382 P.3d 490).

¶41 The prosecution's questioning of Karina was clearly a violation of the court's order in limine. The District Court, however, sustained each of Severson's immediate objections, issued a curative instruction to the jury, and allowed testimony explaining that Severson was a licensed medical marijuana provider. Similarly, Severson's attorney immediately objected to the State's questioning regarding the Defense's efforts to access the cell phone. Though it is unlikely, standing alone, that the prosecutor's improper questions tainted the jury to such an extent as to violate Severson's right to a fair trial, the misconduct again contributes to the Court's consideration of cumulative error.

### b. Ineffective assistance of counsel

¶42 Following the State's violation of the trial court's order in limine, a lengthy discussion was held in which the District Court asked defense counsel what sanction he would seek in response to the State's behavior. After conferring with Severson, counsel chose not to seek a mistrial but reserved the right to do so. The court agreed that Severson would retain the right to seek a mistrial and notified the parties that it would hold a hearing to determine whether to hold the State in contempt of court for its actions. Counsel never moved for a mistrial. Severson argues that counsel's failure to seek a mistrial constitutes ineffective assistance of counsel.

20

¶43 We utilize the two-part test first articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), to determine whether a criminal defendant's trial counsel was unconstitutionally ineffective. *Lehrkamp*, ¶ 25. Under that test, a defendant must show "(1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant." *Lehrkamp*, ¶ 25 (quoting *McGarvey*, ¶ 24). An attorney's performance is deficient if it "[falls] below an objective standard of reasonableness considering prevailing professional norms, and in the context of all circumstances." *McGarvey*, ¶ 25 (citing *Whitlow v. State*, 2008 MT 140, ¶ 16, 343 Mont. 90, 183 P.3d 861). A defendant must overcome a strong "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 140 S. Ct. at 2065 (internal quotations omitted).

¶44 Severson cannot show that his counsel's decision to not move for a mistrial fell below an "objective standard of reasonableness." *McGarvey*, ¶ 25. The record indicates that counsel fully considered the option of moving for a mistrial and made the tactical decision not to do so. By the time of trial, Severson had been in detention for over a year. Had the District Court granted a mistrial motion, Severson likely would have remained in jail while he awaited a new trial. This concern was raised on the record several times. Further, the record indicates that, just prior to deciding not to move for a mistrial, the court recessed to allow counsel time to discuss the implications of moving for a mistrial with Severson. Severson argues that because it was likely the State was attempting to goad a mistrial, double jeopardy would have barred a retrial. *See Oregon v. Kennedy*, 456 U.S.

21

667, 673-74, 102 S. Ct. 2083, 2088 (1982). Whether the District Court would have reached such a conclusion is not at all certain. The merits of Severson's double jeopardy argument aside, the record clearly indicates that Defense counsel considered a mistrial motion and, in consultation with Severson, chose not to pursue it. Severson has, therefore, failed to show that Defense counsel's trial performance was unconstitutionally deficient.

*3. Cumulative error*

¶45     The cumulative error doctrine applies in the rare case in which several errors occur, the cumulative effect of which is to deny the defendant the right to a fair trial. *State v. Novak*, 2005 MT 294, ¶ 35, 329 Mont. 309, 124 P.3d 182. Under the doctrine, the defendant is required to prove that the aggregate effect of the errors denied him a fair trial— mere allegations and speculation that prejudice occurred are insufficient. *Novak*, ¶ 35. If prejudice is shown, however, reversal is required. *State v. Enright*, 2000 MT 372, ¶ 34, 303 Mont. 457, 16 P.3d 366 (citation omitted).

¶46     When considering the cumulative effect of several claimed errors, courts consider:

> each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . . ; and the strength of the government's case.

*State v. Lawrence*, 2016 MT 346, ¶ 30, 386 Mont. 86, 385 P.3d 968 (Baker, J., concurring; quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)).

¶47     The issues in this case, including Severson's claim of self-defense, hinge primarily on the credibility of the witnesses. The errors that occurred during Severson's trial had direct bearing on the credibility of Severson, Karina, and Watson—the three most

22

important witnesses. The burglary reports supported the Defense's theory that Watson and Hayden purposefully intercepted Severson to give the burglars more time and undercut Watson's version of events. The cell phone evidence could have undermined Watson's claim that it was him and not Hayden carrying a pistol during the shooting. The *Brady* material in this case also tends to show that Severson's claimed fear of Hayden was reasonable, supporting his claim that he was afraid for himself and his family when Hayden approached his vehicle. The prosecutor's misconduct likewise goes directly to the credibility of the witnesses at trial. Her improper questioning of Karina in violation of the District Court's order in limine appears to have been a clear attempt to diminish the credibility of Karina and Severson in the eyes of the jury. Additionally, when Watson testified falsely that he had received only $300 from the burglary, the prosecutor took no steps to correct his testimony in the presence of the jury. She ultimately did notify the court of Watson's untruthful statements regarding the amount of money he received from the burglary. She did not, however, attempt to correct his testimony in the moment, despite knowing of its falsity.

¶48 The District Court described this trial as "a disaster." Given the string of missteps and errors in the case, namely the prosecutor's implicit suggestion to the jury through improper questioning that Severson and Karina were drug dealers and the State's failure to disclose the burglary information—all going to the essential issue of witness credibility— we conclude this is "the rare case in which the cumulative effect of the errors" has prejudiced the defendant's right to a fair trial. *See Lawrence*, ¶ 27 (Baker, J., concurring).

¶49 As demonstrated by the jury's decision to convict Severson on the lesser offense of mitigated deliberate homicide, the problems explained above undermine confidence in its verdict. Had the jury been presented with the *Brady* material, had Watson's story been impeached, and had the prosecutor not referred to Severson's and Karina's drug activity, Severson's claim of justifiable use of force would have been stronger. Although the above-stated errors do not warrant reversal individually, we determine their combined effect calls into question the fairness of Severson's trial. *See State v. Cunningham*, 2018 MT 56, ¶ 33, 390 Mont. 408, 414 P.3d 289.

## CONCLUSION

¶50 The cumulative effect of the errors in this case leaves us convinced that Severson is entitled to a new trial. Accordingly, we reverse Severson's conviction and remand to the District Court for further proceedings consistent with this Opinion.

/S/ BETH BAKER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE